698 P.2d 1266

**STATE of Arizona, Appellee,**

v.

**Calvin Arthur LAWSON, Appellant.**

**No. 6124.**

Supreme Court of Arizona,
In Banc.

April 23, 1985.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Galen H. Wilkes, Asst. Attys. Gen., Phoenix, for appellee.

Polley, Polley & Elledge by Karl Elledge, Sierra Vista, for appellant.

CAMERON, Justice.

Defendant, Calvin Arthur Lawson, was convicted and adjudged guilty of first de-gree murder, A.R.S. § 13–1105(A)(2); burglary in the second degree, A.R.S. § 13–1507; kidnapping, A.R.S. §§ 13–1304(A)(3) and (4); and robbery, A.R.S. § 13–1902. Defendant was sentenced to life imprisonment without possibility of parole for twenty-five years for the murder, A.R.S. § 13–703; ten years for the burglary charge, §§ 13–701, –702; fourteen years for the kidnapping charge, §§ 13–701, –702; and five years for the robbery, §§ 13–701, –702. All sentences were to run concurrently. We have jurisdiction pursuant to Ariz. Const. Art. 6 § 5(3) and A.R.S. §§ 13–4031, –4035. We affirm.

Defendant Lawson was tried jointly with Paul A. Wiley. The facts in the instant case are the same as those set forth in *State v. Wiley*, 144 Ariz. 525, 698 P.2d 1244 filed this day. They need not be repeated here.

Although defendant raises essentially different arguments from his co-defendant, there are several identical issues. Because we have disposed of them in Wiley's case, we need not consider them again. We note only that, as in Wiley's case, we found no error as to the issues raised. We consider only the following questions on appeal:

1. Did the police have the requisite quantum of suspicion when they first stopped defendant at 4:30 and then when they later arrested him?

2. Was defendant's statement taken in violation of his fifth amendment privilege against self-incrimination?

3. Did the trial court improperly refuse to sever the cases?

4. Was defendant's sixth amendment right to confront his accusers violated by the trial court's failure to sever the cases?

5. Did the trial court improperly instruct the jury concerning the causation elements of first degree murder?

## THE ARREST

Defendant and his two accomplices were stopped at 4:30 P.M., let go, and then stopped and arrested at 7:30 P.M. Defend-

ant now argues that both stops were illegal. He claims that the police did not have the "reasonable suspicion" necessary to make the first investigative stop. Defendant also contends that the police did not have "probable cause" to justify the eventual arrest. Defendant, therefore, reasons that any evidence collected at either time was illegally seized and thus inadmissible at trial. We do not agree.

1. The 4:30 Stop

The events that led to the initial stop follow: During the afternoon of 10 May 1983, defendant, Wiley and Brown were driving west from New Mexico into Arizona in an older model, blue Ford Falcon, with Virginia license plate number CYP–114. The car was missing a front grille. Wiley was driving. In order to enter the state, they had to stop at the San Simeon agricultural inspection station. At approximately 2:50, the Agricultural Inspector on duty at the station received complaints from tourists that an old Falcon with Virginia license plate number CYP–114 had been weaving along the highway. She saw a car a few minutes later, weaving as it came to the station. It was a "beat-up looking, older model Falcon." When she and her supervisor made their inspection, she noticed that the occupants, two black males and a white female, seemed "giddy." She also observed that the woman was holding a beer can. The Agricultural Inspector wrote down the license number (CYP–114 VA) and notified the Department of Public Safety. After the car left the station, a truck pulled in. The driver informed the Inspector that the people in the car had attempted to sell him drugs and that the female passenger had offered sexual services. He had written down the license plate number and it matched that of Wiley's car. The Inspector then contacted the Department of Public Safety (DPS) and the Cochise County Sheriff's Office in Wilcox, informing them of both the truck driver's allegations and the possibility of a DWI. Wilcox is approximately 80 miles from San Simeon.

At approximately 4:00 P.M. Deputies Allaire and Wolsagle, from the Wilcox sheriff's office, waited at Milepost 344 in Wilcox for the car to pass. While they were waiting, the truck driver stopped and told them of his earlier experiences with the passengers in the car. He described them as two black males and one white female. Because the officers thought that the car might have stopped in Bowie, approximately 30 miles west of San Simeon and 50 miles east of Wilcox, they radioed this information to the deputy there.

Several minutes later, as the deputies began driving toward Bowie, they saw the car—an older model Ford Falcon with a Virginia license plate number CYP–114—carrying two black males and a white female. They stopped the car and checked the identification of all three passengers. At that time the police noticed some "roachclips" and open beer cans. They also saw a pair of binoculars, turquoise jewelry and a hunting knife. One of the officers conducted a field sobriety test on the driver. The officers then helped the three jump start the car and allowed them to drive away. The entire stop took somewhere between thirty and forty-five minutes.

■ Defendant maintains that this stop was improper. He argues that the information given to the police was not sufficient to satisfy the test enunciated in *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) and adopted by this court in *State v. Graciano*, 134 Ariz. 35, 653 P.2d 683 (1982). Under the *Cortez* analysis, in order to determine whether an investigatory stop was proper, we must look at all the circumstances to determine whether they "raise a justifiable suspicion that the *particular individual to be detained is involved in criminal activity*." *Id.* at 37, 653 P.2d at 685. Defendant argues that because the officers relied essentially on hearsay concerning activities that occurred out of state, they did not have a justifiable suspicion to warrant an investigative stop. We do not agree.

First, that the factors relied upon were actions occurring out of state is not necessarily defeating. The purpose of an investigatory stop is to determine, not only whether a crime has been committed, but whether the person stopped is, or is about to be, engaged in criminal activity. *See Cortez,* 449 U.S. at 417, 101 S.Ct. at 695, 66 L.Ed.2d at 621. Here the deputies had reason to believe that defendant was committing or was about to commit a crime. They were told that the passengers in the car were transporting drugs, had engaged in acts of solicitation and that the driver may have been alcohol impaired. These factors gave rise to a reasonable inference that defendant and his friends were continuing these activities once inside Arizona. Thus, the police were empowered to investigate.

Second, we do not find, as defendant contends, that the deputies' reliance upon hearsay created an irrebuttable presumption that they did not possess an articulable suspicion sufficient to warrant an investigatory stop. The United States Supreme Court has held that hearsay information is sufficient to support a finding of probable cause which will justify an arrest if that information is reliable. *See Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Because an arrest is far more intrusive than an investigatory stop, we find no reason not to extend the rationale of these cases to an investigatory stop. As long as the hearsay contains sufficient indicia of reliability, it may, by itself, suffice to supply the necessary information creating a justifiable suspicion that a person is committing, or is about to commit, a crime.

In the instant case, we find that the hearsay was reliable. First, the Inspector informed the police of her own personal observations: the car was weaving; a passenger was drinking beer; all three appeared "giddy" and were nonresponsive to questions asked. We believe the Agricultural Inspector was a reliable source.

Additionally, there was the information supplied by the truck driver. Again, we believe that he was a reliable informant. As we have stated in the past "[w]here an ordinary citizen volunteers information which he has come upon in the ordinary course of his affairs, completely free from any possible gain from furnishing the information, reliability is enhanced." *State ex rel. Flournoy v. Wren,* 108 Ariz. 356, 364, 498 P.2d 444, 452 (1972); *see also State v. Diffenderfer,* 120 Ariz. 404, 586 P.2d 653 (1978) (information supplied by a citizen who voluntarily comes forward to aid law enforcement officers is presumed to be reliable).

Because we find that the information was reliable and sufficient to create a justifiable suspicion, we find no error.

## 2. The 7:30 Arrest

The facts leading up to the arrest are as follows: At approximately 6:35, Deputy Michael S. Rafferty received a call to go to Steven Bayne's house in Bowie, Arizona. He was told that the Fire Department, while putting out a fire, had found a body inside the house. The hands and feet were bound. When Rafferty arrived there, he talked with Carmelo Sanchez, who stated that he had seen a strange car parked in the street behind decedent's house. He noticed the car because it was parked in an unusual spot and because the woman sitting in it did not appear to be from Bowie. Mr. Sanchez described the car as a "smaller to middle-size, dark bluish car, an older one." He also said that he had seen two black men around the car. These men were obviously strangers because no blacks lived in Bowie at that time. The car had been parked about fifty feet from Bayne's house and had left a tire track in the dirt. Deputy Rafferty noticed a path going from the tire track to the area of the house. Because the firemen had been working around that area of the house, it was impossible to determine whether the path led into the house.

Rafferty also talked to fourteen year old Greg Hernandez. He stated that he had

seen a car pulling hurriedly away from the victim's house at approximately 4:05. It is unclear whether he stated that he saw two black men and a white woman or three black men. Hernandez stated that the car was a dark, middle size car with no front grille. Upon hearing that, a DPS officer present at the scene informed Rafferty that he had received information about a dark blue Ford with Virginia license plates, driven by two black males and a white woman. It had been involved in some "illegal activity down by the Port of entry" and was believed to have headed into Bowie. At 6:48, on the basis of this information, Deputy Rafferty broadcast an "Attempt to Locate" request that the police detain the passengers in the car for questioning.

The time sequence of the following facts is somewhat confusing. Sometime after 6:00 P.M., Carol Bredko, one of the victim's neighbors, arrived at the house. She told the police that she had seen the victim alive at around 3:30 that afternoon. Ms. Bredko also stated that the victim owned a white-handled hunting knife about eight inches long. Just prior to the time defendant was arrested, Deputy Allaire arrived at the house. At some point before 7:30, Allaire informed Rafferty that he had seen a bone-handled hunting knife in the blue Ford that he had stopped earlier. It was later determined that the knife belonged to a hitchhiker. At approximately 7:50, Officer Ken Gallagher spotted Wiley's car travelling on Interstate 10 in Pima County some 130 miles west of San Simeon. As a result of the bulletin, he arrested defendant and the other passengers in the car.

Defendant maintains that the police did not have probable cause to make the arrest. We do not agree.

■ We have stated that a police officer has probable cause for an arrest if he has "reasonable grounds to believe that an offense is being or has been committed by the person arrested * * *." *State v. Torrez,* 112 Ariz. 525, 527, 544 P.2d 207, 209 (1975), cert. denied, 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 767 (1976). In reviewing

whether probable cause exists, we look to the totality of the facts and circumstances, *State v. Million,* 120 Ariz. 10, 15, 583 P.2d 897, 902 (1978), known to police officers at the time of the arrest. *United States v. Sherman,* 430 F.2d 1402, 1405 (9th Cir. 1970) cert. denied, 401 U.S. 908, 91 S.Ct. 865, 27 L.Ed.2d 805 (1971). It is also not essential that the arresting officer personally be in possession of all the facts as long as "probable cause exists from the collective knowledge of all the law enforcement agents involved in this operation." *State v. Sardo,* 112 Ariz. 509, 514, 543 P.2d 1138, 1143 (1975).

■ Here, we find that probable cause existed. There was no question that a felony had been committed. The deputies found the victim's hands and feet tied behind him, indicating the possibility of a homicide. The police were also aware that the victim had been alive at least until 3:30 P.M. They knew that a blue car with three out-of-town residents, two of whom were black, had been parked near the victim's house at around 4:00 P.M. They found tracks that led from where the car had been parked to the area of the house; these were the only tracks going from the road to the house. Additionally, one of the police officers had seen articles, such as the knife, that he could have reasonably believed were taken from the victim's house, in a car driving in the Bowie/Wilcox area shortly after the car described by Sanchez was seen outside of Bayne's home. The cars were similar in description. We find that these circumstances were sufficient to establish probable cause.

## DEFENDANT'S STATEMENT

Shortly after their arrest, all three suspects were interrogated by the deputies. At a "voluntariness hearing", see *State v. Owen,* 96 Ariz. 274, 394 P.2d 206 (1960), the judge found defendant's statement to be voluntary. The prosecution, concerned that this ruling might be reversed on appeal, chose not to use the statement in its case-in-chief. The state did, however, introduce the portion of co-defendant Wiley's

statement in which he denied having been in Bowie. On cross-examination, Wiley's counsel then asked the witness, Cochise County Detective William Townsend, who had been describing the circumstances surrounding Wiley's confession: "Isn't it true that at the time of those interviews, all three denied being in Bowie," referring to defendant's statement. Counsel for defendant immediately objected to that question and requested a severance. The trial court refused to strike the response or declare a mistrial.

Defendant now argues that the introduction of the portion of his statement in which he denied having been in Bowie violated his fifth amendment privilege against self-incrimination. Defendant contends that during the custodial interrogation he had invoked his right to remain silent. Because the questioning should have ceased immediately, any subsequent statements were inadmissible at trial. Use of any portion of his statement, he contends, constitutes prejudicial error.

We do not find, however, that defendant's statements were taken in violation of his right to remain silent. Defendant points to the following portion of his statement in arguing that he had withdrawn his waiver of his fifth amendment privilege.

TOWNSEND: Okay, the same thing there. It's homicide there, it's homicide here. The guy is dead. The guy died during the commission of a robbery and that's murder in the first degree. That's first degree murder. And I don't know what that girl [Courtney Brown] told you in the cell right there right before I walked into the room cause she was whispering something to you but it's murder.

LAWSON: That's all she said, they're charging us with murder.

TOWNSEND: Okay.

LAWSON: And....

TOWNSEND: You got anything to say about that? Cause we are going to give you one chance to talk to us right here, right now with this microphone and this tape recorder, and you can give your side

of the story of what happened or ... and that's ... that's your chance. I'm giving you a chance to talk to ,us. If you don't want to talk to us, you can go back to that cell, but we have got witnesses ... let me ... hear me out before you make up your mind ... we've got witnesses and that ain't no bullshit about it because they find out later that I lied to you about something, everything that I told you is ... is going to be thrown out. So we know what we can do and what we can't do. I'm telling you the truth, we have got witnesses that said that she stayed in the car and we wouldn't be able to know that unless we have witnesses. Right?

LAWSON: Right.

TOWNSEND: And we've got witnesses that she stayed in the car and you and your friend walked over to that old man and then you [came] back to that car, got in it, and drove down the street, turned right, turned left, and then you went on the main road again, took off out of town again. There's something been stolen from that house. We know what's been stolen. We're going to do a search warrant on that car. You're not getting next to that car again. Okay? We know what was around that guy's arms and legs because we've been there. We cut it off that guy's arms. It's blue. It's a sash from a robe. It's the same color as that. That came off your friend, the girl. Okay? We have got witnesses ... we've got evidence, we've got stuff that's probably in that car that's stolen from that house. We've got people that can identify it. You got anything to say to that? Nothing at all?

LAWSON: I've got nothing to say.

TOWNSEND: Are you denying being there?

LAWSON: Yeah.

Defendant now argues that the deputies did not honor his desire not to be questioned. We do not agree.

 Generally, if an individual, during custodial interrogation, indicates that he wishes to remain silent, the interrogation must cease. *State v. Hicks*, 133 Ariz.

64, 74, 649 P.2d 267, 277 (1982). If the individual's statement is ambiguous, the police are entitled to ascertain only whether defendant intended to invoke his right to remain silent. *State v. Finehout*, 136 Ariz. 226, 229, 665 P.2d 570, 573 (1983). In reviewing confessions, however, the court must look to the totality of the circumstances. *State v. Knapp*, 114 Ariz. 531, 538, 562 P.2d 704, 711 (1977), cert. denied, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). In reviewing the totality of the circumstances in this case, we do not find that defendant's statement was even an ambiguous request that interrogation cease. Defendant was asked several times whether he had anything to say regarding the accusations put before him. Under a fair reading of the interrogation transcript, we find that his statement "I've got nothing to say" was no more than a response to these questions. The police were, therefore, under no obligation to cease questioning defendant, and his statement that he had never been in Bowie would have been admissible in the state's case in chief. As a result, there was no violation of defendant's privilege against self-incrimination.

## SEVERANCE

Prior to trial, both defendants filed a motion to sever pursuant to Rule 13.4, Arizona Rules of Criminal Procedure, 17 A.R.S. The trial court denied this motion. Defendant renewed this request several times during the course of the trial; each time it was denied. Defendant now claims that this refusal was in error. He argues that he was prejudiced by the testimony of Courtney Brown and Cochise County Detective William Townsend. Further, he argues that his defense was antagonistic to that of Wiley's.

### 1. Courtney Brown

Courtney Brown was the state's chief witness. On direct, she testified as to defendant's and Wiley's actions and conversations before and after the crime. On cross-examination, Wiley's counsel asked her whether she had told other inmates that she had received Bell's Palsy, a muscular disorder affecting the face, from Wiley and whether she had told Wiley that she had been in a mental hospital. Wiley's counsel also questioned her concerning her motives for testifying: whether she was angry with Wiley, was willing to do anything to get out of jail and whether she had said, "I've got a couple of niggers in the woodpile. They'll burn if they don't get right." The testimony complained of occurred on redirect. The state was permitted, over defendant's objection, to ask the witness why she had lied about having been in a mental institution. She stated that she hoped that it would keep Wiley from hitting her. She also testified that her "niggers in the woodpile" statement was made in response to statements made by Wiley that she would never be able to set foot in Arizona and to threats concerning her family. Defendant argues that this testimony reflected badly on him and that the court's limiting instruction was insufficient to protect him.

Defendant raises essentially the problem of "spill-over" or "rub-off": will the jury's unfavorable impression of the defendant against whom the evidence is properly admitted influence the way the jurors view the other defendant. Although a severance is rarely granted when this concern is raised, *see* 1 Wright, *Federal Practice and Procedure* § 223 (1982), it must be given if a defendant can show that he would suffer substantial prejudice from a joint trial. *United States v. Walker*, 706 F.2d 28, 30 (1st Cir.1983). Even if defendant is unable to make this showing before trial begins, the court has a continuing duty at all stages of the trial to grant a severance if prejudice does appear. *Schaffer v. United States*, 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960). Because a severance in the middle of a trial is a severe remedy, it should be resorted to only if prejudice flowing from a joint trial is beyond the curative powers of a cautionary instruction. *See United States v. Becker*, 569 F.2d 951, 964 (5th Cir.), cert. denied, 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978). We agree with the test

adopted by the Eleventh Circuit Court of Appeals, which stated that the focus should be on:

"[w]hether under all circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? * * *."

*United States v. Lippner,* 676 F.2d 456, 464–65 (11th Cir.1982).

■ We find in the instant case that the jury was capable of keeping the evidence separate. First, the rebuttal evidence was the only testimony given of this nature and was a small portion of witness Brown's evidence. Thus, this case does not present the danger of such quantitatively overwhelming testimony that the jury is unable to avoid its effect when reviewing evidence against defendant. *United States v. Singer,* 732 F.2d 631, 635 (8th Cir.1984) (severance required only when evidence against one defendant is so drastically disproportionate that the jury is unable to compartmentalize the evidence as it relates to separate defendants). Additionally, Brown directed herself almost exclusively to her relationship with the co-defendant Wiley, thereby reducing the possibility that the jurors would be confused as to against whom the evidence was offered. We find therefore that the jury in this case would have been able to follow the judge's direction not to consider evidence against Wiley in assessing defendant's guilt.

Defendant argues, however, that the cautionary instruction was not sufficient. We do not agree. We have previously upheld the charge complained of in *State v. Wiley,* supra. Additionally, we have reviewed the law in other jurisdictions and found that similar instructions have been upheld. *See, e.g., United States v. Lippner,* supra at 464–65; *United States*

*v. Aloi,* 511 F.2d 585, 598–99 (2d Cir.), cert. denied, 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975). We, therefore, find no error.

**2. Deputy Townsend**

■ Defendant next argues that the testimony of Deputy Townsend, elicited by co-defendant Wiley, that defendant denied having been in Bowie, see discussion supra, should not have been admitted. Defendant's argument involves an unusual fact pattern warranting further explanation. This case does not present the traditional problem, in which the co-defendant's confession implicating defendant was introduced into evidence, thus damaging defendant. *See, e.g., Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Rather, Wiley's counsel used the portion of defendant's statement, in which defendant lied about having been in Bowie, to establish that Wiley was not alone in lying that he had never been there. In other words, a portion of defendant's statement, potentially damaging to him, was introduced to exculpate his co-defendant.

We have been unable to find any cases dealing with this type of situation. We, therefore, analyze whether Deputy Townsend's testimony required a mistrial and severance by focusing on the concern that underscores all our inquiries into the propriety of a joint trial: whether defendant was able to obtain a fair trial. It is this concern that is evidenced in our rules requiring the trial court to sever if necessary to promote a fair determination of guilt or innocence. Rule 13.4, Arizona Rules of Criminal Procedure, 17 A.R.S. This concern has also caused us to state that a severance should be granted if the court detects the presence or absence of unusual features of the crime that might prejudice a defendant. *State v. Dale,* 113 Ariz. 212, 215, 550 P.2d 83, 86 (1976). *See also* II *ABA Standards for Criminal Justice* Std. 13 (1982) ("In most * * * cases, both prosecution and defense requests for severance are to be judicially evaluated against the goal of a 'fair determination of the defend-

ant's guilt or innocence of each offense.' "). In deciding whether a defendant received a fair trial, we must keep in mind that "[a] defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953).

We look, then, to whether the use of defendant's exculpatory statement in this manner rose to the level of depriving defendant of a fair trial. We find that it did not. First, defendant's statement was properly admissible in the state's case in chief and could, therefore, have been introduced by the state, had it chosen to do so. *See State v. Cruz,* 137 Ariz. 541, 545, 672 P.2d 470, 474 (1983) (focusing on this factor in determining whether defendant was prejudiced by co-defendant's trial conduct). Second, we do not believe that use of this testimony created the type of situation found when defendants with antagonistic defense strategies are joined—that witnesses called by one defendant become the government's best witnesses in convicting the other defendant. *See, e.g., State v. Holup,* 167 Conn. 240, 244–246, 355 A.2d 119, 122 (1974). This testimony did not affirmatively or obviously lay blame for the crimes on defendant. *Cf. United States v. O'Connor,* 737 F.2d 814, 820 (9th Cir.1984) (focusing on the degree to which statement inculpated defendant in holding no constitutional violation). Rather, Wiley's use of defendant's statement in this manner increased the association in the jury's minds between the two men by implying that they were united in their scheme to conceal their activities in Bowie. Although the statement also had the effect of impeaching defendant's general credibility by indicating to the jury his willingness to lie, we do not find that defeating. We have stated that "[i]t is natural that defendants accused of the same crime and tried together will attempt to escape conviction by pointing the finger at each other." *Cruz,* 137 Ariz. at 544, 672 P.2d at 473. This factor by itself is not sufficient, in most instances, to warrant a severance. Rather, this determination depends upon the degree to which this "finger pointing"

infects the trial. Here, the complained of action was not an example of Wiley's conduct throughout the trial. Rather, it was an isolated incident. We, therefore, find that the limited use of this confession did not rise to the level of depriving defendant of a fair trial.

3. Antagonistic Defenses

 As to defendant's claim of antagonistic defenses, a severance is not required every time co-defendants with inconsistent defenses are tried together. *United States v. Crawford,* 581 F.2d 489, 491 (5th Cir. 1978). Rather "a defendant seeking severance based on antagonistic defenses must demonstrate that his or her defense is so antagonistic to the co-defendants that the defenses are mutually exclusive." *Cruz,* supra at 545, 672 P.2d at 474. Such exclusivity requires that the jury, in order to believe the core of evidence offered on behalf of one defendant, must necessarily disbelieve the core of evidence introduced on behalf of the other. *State v. Turner,* 141 Ariz. 470, 472, 687 P.2d 1225, 1227 (1984).

 Defendant bases his argument concerning antagonistic defenses on the allegation that "Wiley was attempting to blame Lawson for criminal acts while Wiley worked on a vehicle." Upon a review of the record, we do not find defendant's arguments persuasive. Wiley and Lawson had essentially similar defenses: that no one actually saw them go into the house and that there was no proof that they placed, or were aware that the lamp had been placed, under the victim's bed. The jury was not forced to believe one defendant at the expense of the other. *Id.* Accordingly, we do not find that their defenses were mutually exclusive.

## RIGHT TO CONFRONTATION

Defendant also argues that he was denied his sixth amendment right to confront his accusers. Defendant focuses on testimony given by Deputy Townsend concerning Wiley's post-arrest actions and defend-

ant's own statement. He also objects to Courtney Brown's testimony previously discussed. Defendant contends that these statements were inadmissible as to him and, therefore, that their introduction against him was unconstitutional.

■ Defendant correctly asserts that these statements were not admissible against him. Because this evidence did not concern defendant's actions with relation to the crime, it was not relevant to the issue of his guilt or innocence. Rule 401, Arizona Rules of Evidence, 17A A.R.S. Even assuming that it bore on defendant's culpability, the testimony was hearsay as to defendant and did not come within any of the evidentiary exceptions. Rules 801–804, Arizona Rules of Evidence, 17A A.R.S.

We do not find, however, that these statements were offered against defendant. As the trial court explained to defendant, Brown's discussion of threats made by Wiley and how, during their relationship, he had beaten her "went to a deeper understanding or better understanding of the jury between one of the defendants, Mr. Wiley and this witness." Additionally, Townsend's testimony that Wiley denied having met the victim and that he had used an alias when first arrested were introduced to demonstrate Wiley's post-arrest actions. The prosecutor made clear by introducing his questions with "[t]he person identified to you then as Jay Johnson [Wiley's alias]" that he was referring only to Wiley and not defendant. Furthermore, the state did not use this testimony in closing argument to inculpate defendant. Thus, these statements were introduced against Wiley only.

■ This is not the end of the inquiry, however. The sixth amendment guarantees a defendant the right to confront his accusers. *State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 187, 644 P.2d 1266, 1273 (1982). In a joint trial, evidence will sometimes be introduced against one defendant and not against the other. Usually, this does not create a constitutional problem. *See, e.g., United States v. Rucker*, 586 F.2d 899, 902 (2d

Cir.1978) ("The fact that evidence may be admissible against one defendant but not against others does not require separate trials."); *see also United States v. Kaplan*, 554 F.2d 958 (9th Cir.), cert. denied, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977). Sometimes, however, evidence which is introduced against one defendant but inadmissible against the other may have devastating consequences for the other defendant. For instance, where one defendant confesses to a crime and his confession inculpates the other defendant, the potential effect of this confession is so great that it is improper to assume that the court may remove the prejudice by telling the jury not to consider it when reviewing the evidence against the non-testifying defendant. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Only if the confessing defendant testifies, thereby subjecting himself to his co-defendant's cross-examination, will the constitutional problem be cured. *Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971). Otherwise, a defendant may be convicted by evidence which was not intended to be introduced against him and which he, therefore, did not have the opportunity to refute through cross-examination, *State v. Sustaita*, 119 Ariz. 583, 589, 583 P.2d 239, 245 (1978)—a result abhorrent to the sixth amendment. We must remember that the Bruton rationale was intended to be a limited exception to the rule that the jury can be trusted to follow the court's limiting instruction and consider only the evidence admitted against a defendant when deciding his guilt. *See Parker v. Randolph*, 442 U.S. 62, 74 n. 7, 99 S.Ct. 2132, 2140 n. 7, 60 L.Ed.2d 713, 724 n. 7 (1979). Only when the evidence complained of may have devastating consequences should the jury disregard the judge's charge, *id.*, will we find that the Confrontation Clause mandates that we recognize a *Bruton* type exception and declare a mistrial.

In reviewing the evidence, we find no confrontation problem. First, the statements complained of contained no refer-

ence to defendant. Additionally, the testimony did not have a potentially devastating impact upon defendant's case. It contained no admissions to the crimes nor did it implicate defendant in any manner. Finally, this was not the type of case in which the evidence was so confusing or overwhelming as to one defendant to make it difficult for the jury to determine which information was offered against which defendant. The issues were straight-forward and the evidence was introduced in an orderly and organized manner. We, therefore, find no error.

 We now turn to Detective Townsend's statement that defendant had denied being in Bowie. We find that it was properly admitted. It is important to point out that this was *defendant's own* statement that was introduced. Under Rule 801(d)(2), Arizona Rules of Evidence, 17A A.R.S., a defendant's statement is admissible against him as an exception to the hearsay rules. *State v. Gerlaugh*, 134 Ariz. 164, 168, 654 P.2d 800, 804 (1982). As long as it is made voluntarily, it is admissible to prove defendant's guilt. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We find no error.

### JURY INSTRUCTION

 At trial, the judge gave the following instruction concerning felony murder:

The crime of first degree murder requires proof of the following two things:

(1) The defendant, acting either alone or with one or more other persons, committed or attempted to commit kidnapping, burglary or robbery; and

(2) In the course of and in furtherance of the crime, the defendant or another person caused the death of any person. In order to find the defendants guilty of first degree murder, you must find that the death was proximately caused by the acts of the defendants.

Conduct is the cause of a result when both of the following exist:

(1) But for the conduct, the result in question would not have occurred.

(2) The relationship between the conduct and results satisfies any additional causal requirement imposed by the statute defining the offense.

Defendant now argues that the jury instructions were inconsistent and confusing. Additionally, he argues that this confusion could have been cured by submitting a special interrogatory form of verdict to the jury, which he requested.

First, defendant was not entitled to an interrogatory form of verdict. Rule 23.2, Arizona Rules of Criminal Procedure, 17 A.R.S. entitles defendant only to a verdict of guilty or not guilty. As the comment explains, the rule abolishes special verdicts except in the case of insanity acquittals. *See also United States v. Shelton*, 588 F.2d 1242, 1251 (9th Cir.1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979) (special verdicts are disfavored in criminal jury trials); 3 Wright, *Federal Practice and Procedure* § 512 (2d ed. 1982) (special verdicts are disfavored because they restrict the jury's right to return a verdict in the teeth of the law and facts.)

Defendant also argues that it was inconsistent to give a "but for" test for causation with a proximate cause instruction. We do not agree. The "but for" standard, as defined in A.R.S. § 13–203, was not intended to supersede prior case law but instead to be consistent with the proximate cause analysis as enunciated in *State v. Hitchcock*, 87 Ariz. 277, 350 P.2d 681 (1960), appeal dismissed, 365 U.S. 609, 81 S.Ct. 823, 5 L.Ed.2d 821 (1961). *See* Gerber, *Criminal Law of Arizona* 32 (1978). Thus, we do not find that the trial court acted improperly in defining both standards to the jury.

Pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), defendant raises, without discussion, a number of additional issues. Because we have reviewed the record and find no fundamental error, we find it unnecessary to address those issues in full.

The conviction, judgment, and sentence of the defendant are affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS, J., concur.

FELDMAN, Justice, specially concurring.

I concur in this opinion for the same reasons set forth in State v. Wiley.