900 P.2d 1

STATE of Arizona, Appellee,

v.

David Wayne GRANNIS, Appellant.

STATE of Arizona, Appellee,

v.

Daniel Ethan WEBSTER, Appellant.

Nos. CR–91–0279–AP, CR–91–0280–AP.

Supreme Court of Arizona,
En Banc.

July 25, 1995.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals Section and Dawn M. Northup, Asst. Atty. Gen., Phoenix, for appellee.

Sara Andersson–Kaufman, Tucson, for appellant David Wayne Grannis.

Susan A. Kettlewell, Pima County Public Defender by Rebecca A. McLean and Nancy F. Jones, Asst. Public Defenders, Tucson, for appellant Daniel Ethan Webster.

## OPINION

CORCORAN, Justice.

Defendants David Wayne Grannis and Daniel Ethan Webster were jointly tried in Pima County Superior Court. On May 28, 1992, the jury convicted them both of premeditated first degree murder, two counts of theft, and trafficking in stolen property. After holding an aggravation/mitigation hearing, the trial court sentenced Grannis and Webster to death. Their convictions and death sentences are automatically appealed to this court. See A.R.S. § 13–4033; rules 26.15, 31.2(b), and 31.15(a)(3), Arizona Rules of Criminal Procedure. Both also filed separate notices of appeal. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031, –4033, and –4035. Because we find that the trial court improperly admitted certain evidence at the joint trial, we reverse the convictions of Grannis and Webster and remand this case for retrial.

## FACTS AND PROCEDURAL HISTORY

### I. Facts

Webster and Grannis first met in Phoenix in May 1989. Grannis, who was 31 years old at the time of the murder, had no criminal record and had completed two semesters of college. The 20–year–old Webster was a high school dropout with a history of substance abuse. When Webster lost his job, he moved in with Grannis who testified that he became Webster's "caretaker." Although Grannis admits to having had a homosexual experience and having possessed homosexual pornography, he claimed that his relationship with Webster was not sexual.

In June 1989, Webster and Grannis went to Las Cruces, New Mexico, where they stayed first with Grannis's mother for a few weeks and then with a friend. In August 1989, the two began hitchhiking to Los Angeles to see Webster's family. Outside of Tucson on the evening of August 24, 1989, the victim, Richard, picked up Grannis and Webster in his BMW automobile. According to Grannis, Richard invited them to spend the night at his house and offered to give them a ride back to the freeway in the morning. Grannis and Webster accepted the invitation, and they rode back to Richard's house, stopping on the way to buy beer and food.

Neighbors called the police in the early morning hours of August 25 to report screaming coming from Richard's house. When the sheriff's department arrived at Richard's house around 1:30 a.m., they found Richard's dead body in the hallway off the living room. Richard had sustained approximately 13 sharp force injuries and numerous blunt force injuries. During their investigation, the police discovered that Richard's BMW was missing from his house. In tracking down the missing car, the police conducted interviews that led them to suspect Grannis and Webster of Richard's murder.

The evidence at trial showed that Grannis and Webster took Richard's BMW on August 25 and drove it to California. They first visited Webster's friend Eva Marie Lopez in Riverbank, California. From there they went to the house of Lopez's cousin, Johnny

Baker, where they stayed for several days. Lopez overheard Webster bragging to Baker about committing a murder. Webster told Baker that he had killed someone and that he liked the feeling it gave him. Webster described and demonstrated the murder and told Baker that he took credit cards and $200–$300 in cash from Richard's wallet. Lopez also saw Grannis motion to Webster to keep quiet and not talk about the incident.

During their stay in California, Lopez saw Grannis and Webster remove two bags containing clothes, papers, and a camera from Richard's car. They burned the papers and a T-shirt that appeared to have blood on it and gave their friends the rest of the clothing and the camera. Grannis sold the BMW for $3000 by forging Richard's signature on the bill of sale. Grannis gave Baker $300 and spent the rest of the car sale proceeds taking Webster to the Hershey's Chocolate Factory and Disneyland.

Grannis and Webster then returned to Grannis's mother's mobile home in New Mexico, which is where they were living when they were arrested for murder in July 1990. When they arrested the two men, the police found a switchblade and 4 knives in Webster's bedroom, each of which was consistent with some of Richard's stab wounds. The police also found a collection of pornographic homosexual pictures in Grannis's bedroom closet.

At trial, the state produced fingerprint evidence that placed Grannis and Webster at the scene of Richard's murder. The state argued to the jury that Webster and Grannis had killed Richard in the course of robbing him or burglarizing his home. Webster did not testify at the trial.

Grannis testified on his own behalf and gave the following account of what took place at Richard's house during the late evening and early morning hours of August 24 and 25. Upon arriving at Richard's house, the three men talked and drank beer on the back patio. After about two hours, Webster showered and went to bed. Richard then sexually propositioned Grannis, who refused the offer, explaining that Webster did not approve of homosexual activity. After Richard persisted, Grannis reluctantly consented to having

sex, and they headed toward the master bedroom. At the bedroom door, Richard became sexually aggressive, at which point Grannis changed his mind and tried to resist Richard's advances. Richard grabbed Grannis's wrists to push him into the bedroom, and Grannis began to scream. His screams awakened Webster, who came into the room and punched Richard in the face. Richard still would not loosen his grip on Grannis, so Webster kept trying to pull them apart.

When Grannis finally broke loose from Richard's grasp, he began to run away intending to leave the house. Grannis saw Webster and Richard struggling with each other on the floor, and he heard Webster yelling to get their things together. Grannis replied, "Let's just get out of here." Grannis grabbed Richard's keys from the kitchen and went to get their belongings from his car. Several minutes later Webster ran out of the house yelling, "Let's get out of here," and Grannis, thinking that Richard was chasing them, started Richard's car. They drove away. Grannis testified that he and Webster never again discussed what had happened at Richard's that night. Grannis alleged that he did not know Richard was dead until the police arrested him for murder.

## II. *Procedural History*

On July 13, 1990, Grannis and Webster were jointly indicted in Pima County Superior Court for first degree murder, armed robbery, first degree burglary, theft by controlling stolen property, and trafficking in stolen property.

On November 16, 1990, Grannis filed a motion to sever his trial from Webster's. The trial court granted the motion for severance *over Webster's objection.* After completing discovery, the state moved to reconsolidate the trials. Despite Grannis's objection, the trial court granted the motion for reconsolidation, provided that the state agree not to use any statements by Webster at trial that facially incriminated Grannis. *See* rules 13.3 & 13.4, Arizona Rules of Criminal Procedure; *Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476 (1968).

Before trial, the state objected to the admission of testimony about Richard's alleged homosexuality. The trial court ruled that it would allow such evidence to corroborate possible testimony by defendants.

The trial began on May 14, 1991. Webster claimed self-defense, and Grannis alleged that he was not present when the murder occurred and lacked any culpability for the murder. The jury found both Grannis and Webster guilty of premeditated first degree murder, two counts of theft, and trafficking in stolen property.

The trial judge held an aggravation/mitigation hearing on August 19, 1991. Grannis and Webster each received concurrent, presumptive sentences of 5 years' imprisonment for each theft conviction and 7 years' imprisonment for trafficking in stolen property. The trial court found as an aggravating factor that the murder was committed in an especially heinous, cruel, or depraved manner based on the number of injuries to the victim, the force necessary to inflict those injuries, and "all of the evidence in the case." *See* A.R.S. § 13–703(F)(6). The trial court found Webster's age to be a statutory mitigating factor, pursuant to § 13–703(G)(5), because he was 20 years old when he committed the offense. The combination of Webster's immaturity, impulsivity, learning disability, and low intellectual functioning were found to be a nonstatutory mitigating factor. The court also found that Grannis's lack of a prior criminal record was a nonstatutory mitigating factor. The judge concluded that the mitigating factors were not sufficiently substantial to call for leniency and sentenced both defendants to death for Richard's murder.

## ISSUES PRESENTED

Although Grannis and Webster raise numerous issues in their briefs, the disposition of this case requires us to address only 4 of them.

Both Grannis and Webster raised the following issue:

I. Whether the trial court erred by admitting pornographic homosexual photographs into evidence.

Grannis raised the following issue:

II. Whether the trial court erred by reconsolidating the trials of Grannis and Webster.

Webster raised the following issues:

III. Whether the trial court's jury instruction regarding the use of deadly force was improper.

IV. Whether the trial court improperly admitted the telephonic deposition of a state's witness.

## DISCUSSION

I. *Admissibility of Pornographic Homosexual Photographs*

■ Grannis and Webster contend that the trial court erred by admitting into evidence three color photographs showing as a collage the collection of pornographic homosexual pictures found in Grannis's closet. The pictures graphically depict male genitalia and naked men engaged in a variety of homosexual acts, but do not depict Grannis or Webster. Before trial, Webster filed a motion in limine to exclude the pornographic photographs as irrelevant. At a hearing on the motion during trial, Grannis objected to the admission of the photographs because they lacked probative value and were unduly prejudicial. The trial court denied the motion in limine. When the state later moved to admit the photographs, Grannis and Webster objected based on lack of foundation, and Grannis also objected as to relevancy. Ultimately, the court overruled the objections and admitted the photographs into evidence. Although Webster's counsel did not specifically object to the prejudicial effect of the photographs, counsel for both defendants stated at the beginning of trial that each would join in the other's motions and objections unless they told the court otherwise. *See People v. Brown*, 110 Cal.App.3d 24, 167 Cal.Rptr. 557, 562 (1980) ("On appeal, a defendant cannot take advantage of objections made by a co-defendant in the absence of stipulation or understanding to that effect."); *see also State v. Marahrens*, 114 Ariz. 304,

306, 560 P.2d 1211, 1213 (1977). The trial court approved this arrangement.

▉ The trial court has the discretion to decide whether to admit photographs, and we will not disturb that decision absent a clear abuse of discretion. *State v. Stuard,* 176 Ariz. 589, 602, 863 P.2d 881, 894 (1993). We apply a two-prong test for determining the admissibility of the pornographic photographs. *Stuard,* 176 Ariz. at 602, 863 P.2d at 894. The first inquiry is whether the photographs are relevant to an issue in this case. Rule 402, Arizona Rules of Evidence; *Stuard,* 176 Ariz. at 602, 863 P.2d at 894. If relevant, the second inquiry is whether the probative value of the photographs is substantially outweighed by the danger of unfair prejudice. Rule 403, Arizona Rules of Evidence; *Stuard,* 176 Ariz. at 602, 863 P.2d at 894. We conclude that the homosexual pornographic photographs were marginally relevant, but the trial judge abused his discretion by admitting them because their probative value was substantially outweighed by the danger of unfair prejudice to both Grannis and Webster.

"Photographic evidence is relevant if it helps the jury understand any disputed issue." *Stuard,* 176 Ariz. at 602, 863 P.2d at 894; *see* rule 401, Arizona Rules of Evidence. The state argues that the photographs are relevant to show that Grannis had ongoing homosexual tendencies and was therefore unlikely to resist Richard's sexual advances. However, Grannis's opening statement and his trial testimony both indicated that he had a past homosexual experience and that he initially consented to Richard's advances on the night of the murder. In conjunction with this testimony, the photographs added very little to the jury's understanding of the issues.

▉ In light of their marginal relevance, the trial court should have excluded the photographs because their probative value was substantially outweighed by the danger of unfair prejudice. *See* rule 403, Arizona Rules of Evidence. The graphic images of males involved in homosexual acts would likely have repulsed many of the jurors. The jurors' verdict may well have been improperly influenced by their revulsion and not entirely based on a belief that the state proved the elements of the crime. *See State v. Steele,* 120 Ariz. 462, 464, 586 P.2d 1274, 1276 (1978). The danger of unfair prejudice created by the photographs extended to both Grannis and Webster. The offensive photographs were unfairly prejudicial to Grannis because the jury learned that he had collected them. They were prejudicial to Webster because the jury associated these offensive photographs with him, even though they did not belong to him. Webster was further harmed by the trial court's failure to instruct the jury to consider the photographs only against Grannis and not against Webster. Because we cannot say beyond a reasonable doubt that the jury would have convicted in the absence of this error, it is not harmless. Accordingly, we hold that the trial court committed reversible error by admitting the photographs into evidence. *See State v. Chapple,* 135 Ariz. 281, 297–98, 660 P.2d 1208, 1224–25 (1983).

Although we are reversing defendants' convictions and death sentences based on the erroneous admission of evidence, we also address the following three issues because defendants will likely raise them again on retrial.[1]

---

1. One additional issue deserves mention. Count two of the indictment charged Grannis and Webster with armed robbery, and the jury convicted them of the lesser included offense of theft of property worth $1500 or more. Grannis and Webster contend that the state failed to present sufficient evidence to prove the value of the stolen property. At trial, the state showed only that Richard withdrew $200 from an automatic teller machine on the evening of the murder, that Richard's wallet was never found, and that Webster told Baker he took the wallet. The state confesses error on the valuation issue and asserts that this court should modify Grannis's and Webster's convictions to reflect a theft of property worth less than $250. *See* rule 31.17(d), Arizona Rules of Criminal Procedure. We agree that the state failed to provide sufficient evidence of valuation to support the jury's verdict. *See State v. Rushing,* 156 Ariz. 1, 4–5, 749 P.2d 910, 913–14 (1988). However, because we are reversing all defendants' convictions on other grounds, modification of defendants' theft convictions would serve no purpose here. On remand, with regard to count two, the trial court may allow the jury to consider only the offense of theft of property worth $250 or less. *See State v. Ortiz,* 120 Ariz.

## II. *Reconsolidation of the Trials*

■ On November 16, 1990, Grannis moved to sever his trial from Webster's. At a hearing on the motion, the state conceded that it was unprepared to argue the issue and told the court that "[a]s far as severance goes, if [Grannis's counsel] believes that the circumstances warrant a severance, I have no objection." Grannis's counsel argued that severance was necessary because statements attributed to Webster were very damaging to Grannis. Webster's counsel objected to the severance because he thought that a joint trial was favorable for Webster's defense. At that time, Webster could not have known that the trial court would admit Grannis's prejudicial pornographic photographs into evidence. The trial judge granted Grannis's severance motion over Webster's objection.

On April 22, 1991, after the completion of discovery, the state moved to reconsolidate the trials of Grannis and Webster. The state argued that reconsolidation would save time and money because the co-defendants would not present antagonistic defenses, the evidence against them was identical, and many witnesses were from out of state. Grannis argued that Webster would probably not testify at a joint trial, and therefore Grannis would be denied the chance to cross-examine Webster about the incriminating statements that he made to Baker and Lopez.[2] Webster was not present at the hearing on the motion. The trial court granted the state's motion to reconsolidate, provided that the state agree not to introduce any statements made by Webster that facially incriminated Grannis. Grannis now contends that reconsolidation of the trials was reversible error.

■ When two or more defendants have been joined for trial, rule 13.4(a), Arizona Rules of Criminal Procedure, requires a court to sever the trials of defendants on motion of a party if "necessary to promote a fair determination of the guilt or innocence of any defendant of any offense." The decision to grant or deny a severance motion is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *State v. Cruz*, 137 Ariz. 541, 544, 672 P.2d 470, 473 (1983). In making that decision, the trial court must "balance the possible prejudice to the defendant against interests of judicial economy." *Cruz*, 137 Ariz. at 544, 672 P.2d at 473. When, as here, a defendant challenges the trial court's failure to grant a severance, he "must demonstrate compelling prejudice against which the trial court was unable to protect." *Id.*

■ Cases have generally held that a defendant is prejudiced to such a significant degree that severance is required when: (1) evidence admitted against one defendant is facially incriminating to the other defendant, *see Bruton*, 391 U.S. at 124–26, 88 S.Ct. at 1621–22; (2) evidence admitted against one defendant has a harmful "rub-off effect" on the other defendant, *see State v. Lawson*, 144 Ariz. 547, 555–56, 698 P.2d 1266, 1274–75 (1985); (3) there is a significant disparity in the amount of evidence introduced against each of the two defendants, *see Lawson*, 144 Ariz. at 556, 698 P.2d at 1275; or (4) co-defendants present defenses that are so antagonistic that they are mutually exclusive, *see State v. Kinkade*, 140 Ariz. 91, 93–94, 680 P.2d 801, 803–04 (1984), or the conduct of one defendant's defense harms the other defendant, *see Cruz*, 137 Ariz. at 545–46, 672 P.2d at 474–75. Sometimes, however, a curative jury instruction is sufficient to alleviate any risk of prejudice that might result from a joint trial. *See State v. Runningeagle*, 176 Ariz. 59, 68, 859 P.2d 169, 178, *cert. denied*, —— U.S. ——, 114 S.Ct. 609, 126 L.Ed.2d 574 (1993).

After reviewing the record, we conclude that the trial court did not abuse its discretion by denying Grannis's motion to sever because Grannis has failed to show that he suffered substantial prejudice from the joint trial. Grannis's case does not fit into any of the 4 categories mentioned above.

---

384, 385–86, 586 P.2d 633, 634–35 (1978) (holding that double jeopardy clause precludes a second trial on the same offense "once a reviewing court has determined that the evidence introduced at [first] trial was insufficient to sustain the verdict").

**2.** At the joint trial, Grannis testified on his own behalf, but he did not· call Webster as a witness. Webster did not testify on his own behalf.

First, both Grannis and the state agree that none of the evidence admitted against Webster facially incriminates Grannis. *See Bruton,* 391 U.S. at 124–26, 88 S.Ct. at 1621–22 (holding that admitting the confession of co-defendant, which incriminated both co-defendant and Bruton, into evidence at joint trial violated constitutional rights of Bruton). Johnny Baker and Eva Lopez testified about statements made by Webster indicating that he had killed someone, but none of Webster's statements implicated Grannis in the murder. Furthermore, the witnesses were admonished to exclude from their testimony any statements that Webster made about Grannis.

Second, Grannis suffered no rub-off effect. Severance is rarely granted when a defendant alleges that the jury's unfavorable impression of his co-defendant, against whom evidence is properly admitted, will influence the way the jurors view the defendant himself. *Lawson,* 144 Ariz. at 555, 698 P.2d at 1274. To determine if a rub-off problem exists, the court must ask whether the jury can "keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him." *Lawson,* 144 Ariz. at 556, 698 P.2d at 1275, quoting *United States v. Lippner,* 676 F.2d 456, 464–65 (11th Cir.1982). Grannis contends that Webster's statements to Baker about how he enjoyed committing the murder were so horrible that they rubbed off on Grannis and turned the jury against him. We conclude that these statements did not prejudice Grannis to such an extent that he was entitled to a separate trial. Although the statements reflected negatively on Webster, they also exculpated Grannis. Furthermore, it is clear from the record that the statements pertaining to the murder were attributable solely to Webster and not to Grannis. In this case, "the jury was capable of keeping the evidence separate" because the issues were not complex, the evidence was not complicated, and the judge instructed the jury as follows: "There are two defendants. You must consider the evidence and the charges against each defendant separately." *Lawson,* 144 Ariz. at 556, 698 P.2d at 1275; *see also State v. Wiley,* 144 Ariz. 525, 532–33, 698 P.2d 1244, 1251–52 (1985).

Third, there was no significant disparity in the amount of evidence offered against Grannis and Webster. *See Lawson,* 144 Ariz. at 556, 698 P.2d at 1275. Even if such a disparity exists, severance is required only if "the jury is unable to 'compartmentalize the evidence as it relates to separate defendants.'" *United States v. Singer,* 732 F.2d 631, 635 (8th Cir.1984), quoting *United States v. Jackson,* 549 F.2d 517, 525 (8th Cir.1977). This was not the case here. Grannis's testimony and the physical evidence placed both Grannis and Webster at the scene of the crime. Grannis's fingerprints were found on Richard's front door and on a beer bottle in Richard's house. Webster left a palm print on the wall near where Richard's body was found. Furthermore, after the murder Grannis sold the victim's car, and Webster bragged to a friend that he had killed someone. Based on this record, we conclude that the evidence was not so disparate that the jury was incapable of compartmentalizing the evidence as it related to Grannis and Webster. *See Singer,* 732 F.2d at 635.

Fourth, Grannis and Webster did not present antagonistic defenses. Defenses are mutually antagonistic if "in order to believe the core of the evidence offered on behalf of one defendant, [the jury] must disbelieve the core of the evidence offered on behalf of the co-defendant." *Cruz,* 137 Ariz. at 545, 672 P.2d at 474. In *State v. Kinkade,* for example, each co-defendant alleged that the other fired the fatal shot, so this court reversed their convictions and sentences and remanded for separate trials. 140 Ariz. at 94, 680 P.2d at 804. In this case, Webster alleges that he killed Richard in self-defense, and Grannis contends that he was not present during the murder. There is nothing contradictory about these defenses, so the jury could easily believe all the evidence offered on behalf of each defendant.

Finally, we cannot say that the "actual conduct" of Webster's defense prejudiced Grannis. In *Cruz,* we required a retrial and a severance because Cruz's co-defendant elicited testimony on cross-examination that Cruz had links to organized crime and had

hired people to commit murder. 137 Ariz. at 546, 672 P.2d at 475. Nothing so damaging to Grannis was elicited in the course of Webster's defense.

 Despite our conclusion that denial of a severance was not reversible error under the circumstances, the trial judge presiding on retrial must carefully consider this issue if either defendant raises it again. Our decision here is based on the evidence presented and the strategies employed at trial. In further proceedings, changes in trial strategy will require a reevaluation of the severance issue. Finally, if Grannis and Webster are tried together again, a more extensive curative instruction telling the jury to consider the evidence against each defendant separately would be in order. *See Runningeagle*, 176 Ariz. at 68, 859 P.2d at 178; *Wiley*, 144 Ariz. at 532–33, 698 P.2d at 1251–52.

III. *Jury Instruction on Use of Deadly Force*

 Webster argues that the trial court gave improper instructions regarding the use of deadly force, thereby depriving him of his right to due process and a fair trial, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and art. 2, §§ 4, 24 of the Arizona Constitution.

Arizona permits the use of deadly force as follows:

A person is justified in threatening or using deadly physical force against another:

1. If such person would be justified in threatening or using physical force against the other under § 13–404, and

2. When and to the degree a reasonable person would believe that deadly physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly physical force.

A.R.S. § 13–405. Under A.R.S. § 13–404, a person is justified in threatening or using physical force against another

when and to the extent a reasonable person would believe that physical force is immediately necessary to protect himself

against the other's use or attempted use of unlawful physical force.

Deadly force may also be used to protect a third person pursuant to A.R.S. § 13–406:

A person is justified in threatening or using physical force or deadly physical force against another to protect a third person if:

1. Under the circumstances as a reasonable person would believe them to be, such person would be justified under § 13–404 or 13–405 in threatening or using physical force or deadly physical force to protect himself against the unlawful physical force or deadly physical force a reasonable person would believe is threatening the third person he seeks to protect; and

2. A reasonable person would believe that such person's intervention is immediately necessary to protect the third person.

 Under A.R.S. §§ 13–404 and –405, *apparent* deadly force can be met with deadly force, so long as defendant's belief as to apparent deadly force is a reasonable one. An instruction on self-defense is required when a defendant acts under a reasonable belief; actual danger is not required.

In Arizona, a self-defense instruction will be given only if the defendant can demonstrate the following three elements: (1) he *reasonably believed* he was in immediate physical danger; (2) he acted solely because of this belief; and (3) he used no more force than *appeared reasonably necessary* under the circumstance.

*State v. Dumaine*, 162 Ariz. 392, 404, 783 P.2d 1184, 1196 (1989) (emphasis added). "Even the slightest evidence of self-defense mandates an instruction on the issue." *Dumaine*, 162 Ariz. at 404, 783 P.2d at 1196.

Webster objected to the instruction given to the jury regarding deadly force, arguing that he was entitled to an instruction on self-defense and that the instruction given misstated Arizona law. The trial court gave the following instruction:

A defendant is justified in threatening or using physical force in self-defense if the following two conditions exist:

1. A reasonable person in the defendant's situation would have believed that physical force was immediately necessary to protect against another's use or attempted use of physical force; and

2. The defendant threatened or used no more physical force than would have appeared necessary to a reasonable person in the defendant's situation.

Actual danger is not necessary to justify the threat or use of physical force in self-defense. It is enough if a reasonable person in the defendant's situation would have believed that he was in immediate physical danger.

. . . .

*A defendant may only use deadly physical force in self-defense to protect himself from another's use or attempted use of deadly physical force.*

(Emphasis added.)

Webster argues that the instruction incorrectly led the jury to believe that actual deadly force rather than reasonably apparent deadly force was necessary to justify deadly force in response. We agree that the jury could easily have interpreted the trial court's instruction that way.

Although the initial description of when self-defense is justified correctly reflected the statutory language of A.R.S. § 13–§404(A), the later description regarding deadly force was incorrect. It could plausibly be interpreted as a limitation on the entire instruction. By concluding with the statement that "[a] defendant may *only* use deadly physical force ... to protect himself from another's use or attempted use of deadly force" (emphasis added), the instruction suggested that reasonably apparent physical force could justify non-deadly physical force by the defendant, but that only actual deadly force could justify defendant's deadly force. Accordingly, we hold that the trial court's instruction regarding justification for deadly force constitutes error.

Webster did not claim in his defense that the victim was actually armed or attempting to use deadly force against Webster or Grannis; instead, Webster claimed that he reasonably believed, even if incorrectly, that deadly force was necessary based on the victim's actions. Webster was entitled to have the jury properly consider whether his use of deadly force was justified under A.R.S. § 13–405. The jury could not adequately consider this question without being properly instructed as to the correct standard set forth in § 13–405. *See, e.g., Everett v. State,* 88 Ariz. 293, 299, 356 P.2d 394, 398 (1960) (reversing conviction for assault with deadly weapon where trial court failed to instruct jury on self-defense). On retrial the trial court should correctly instruct the jury on self-defense.

### IV. *Admission of Telephonic Deposition*

Before trial, the state filed a motion for a videotaped deposition of Ms. Toby Falk. The state presented evidence that the witness, who was in New York, was ill and unable to travel. Grannis moved for a telephonic deposition instead. Webster opposed the taking of the deposition by videotape or telephone and asserted his right to be present during the deposition, pursuant to rule 15.3(d).

The trial court ordered that the state be allowed to take a videotaped deposition of Falk and ordered the state to produce additional evidence from Falk's doctor that she could not travel to Arizona. The state filed a facsimile letter from the doctor saying that Falk could not travel because she had multiple sclerosis and was undergoing treatment. The state then made an oral motion for a telephonic deposition when neither Webster nor his attorney were present, and the trial court granted the motion. Falk, who was in New York, was telephonically deposed on April 19, 1991. Webster was not present in Tucson for the telephonic deposition; however, Webster's counsel was present and had the opportunity to cross-examine the witness. During the deposition, Webster's counsel made several hearsay objections. At trial, Webster's counsel objected to the hearsay statements and alleged there were numerous errors in the typed transcript of the deposition. The audiotape of Falk's deposition was played to the jury during the trial.

We have compared the tape-recorded statement with the transcript of it prepared

by a court reporter and find that the reporter inaccurately transcribed the deposition in several places. Because we are reversing the convictions on an unrelated ground, and we find that the admission of the tape and transcript was error for reasons unrelated to the transcription mistakes, we need not address the effect of the transcription errors.

Ms. Falk testified that she heard screams coming from Richard's house on the night he was killed and that she called the police that night about the screams. Toby Falk's son, Daniel Falk, testified at the trial that he, too, heard screams coming from Richard's house the night of the murder.

Webster argues that admission of the deposition violated rules 15.3(d) and 19.3(c)(1), Arizona Rules of Criminal Procedure. Webster further argues that admission of the deposition at trial violated his right to face-to-face confrontation under the federal and state constitutions. U.S. Const. amend. 6; Ariz. Const. art. 2, § 24. He asserts that the state did not adequately prove that the witness was unavailable and that the trial court failed to make a factual finding of unavailability. *See* rule 804(a)(4), Arizona Rules of Evidence; *Ohio v. Roberts*, 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980); *State v. Edwards*, 136 Ariz. 177, 181–83, 665 P.2d 59, 63–65 (1983).

■ The state argues that Webster did not properly preserve the issue for appeal because he did not object at trial when the state played the audiotape to the jury. We find that Webster properly preserved the issue for appeal by filing a motion for status conference, in which he asserted his right to be present at the taking of the deposition, before trial. *See State v. Lindsey*, 149 Ariz. 472, 476, 720 P.2d 73, 77 (1986) (stating that pretrial motion ruled on by court preserves issue for appeal even if counsel does not renew objection at trial). The state was the moving party, and thus under rule 15.3(d) had the duty to notify the officer having custody of the defendant of the deposition, and no such notice was given here. Rule 15.3(d) also requires a written waiver of an in-custody defendant's right to be present at a deposition, and no such written waiver exists here.

Rule 804(b)(1), Arizona Rules of Evidence, states that former testimony in criminal actions is not excluded as hearsay "as provided in Rule 19.3(c), Rules of Criminal Procedure" if the declarant is unavailable. "[A] condition precedent to admissibility under Rule 19.3 is that the deposition be taken in accordance with Rule 15.3." *State v. Alvarado*, 158 Ariz. 89, 93, 761 P.2d 163, 167 (App.1988). Rule 15.3(d) provides that a defendant "*shall* have the right to be present at any examination under Rules 15.3(a)(1) and (a)(3)," even if the defendant is in custody. (Emphasis added.) Falk's deposition was taken pursuant to rule 15.3(a)(1), which states that the trial court may order a deposition if "[a] party shows that the person's testimony is material to the case and that there is a substantial likelihood that the person will not be available at the time of trial." The purpose of rule 15.3 is "to protect the defendant's right to confrontation." Rule 15.3, comm. cmt. to 1993 Amendment. The rule was amended in 1993 to permit the recording of a deposition by audio recording device, to permit the taking of a deposition by telephone, and to reduce expense to the parties and inconvenience to witnesses. *Id.*

■ The state argues that the rule requires that a defendant show his presence is "reasonably necessary" at the deposition. The state cites as authority *State v. Apelt*, 176 Ariz. 349, 365–67, 861 P.2d 634, 650–52 (1993), which upheld the denial of a defendant's request for funds for counsel or an investigator to travel to Germany to look for mitigating evidence in a death case with no adequate showing of necessity. We find *Apelt* to be inapposite and reject the proposition that rule 15.3(d) includes a qualification that defendant's presence be "reasonably necessary." *See State v. Shearer*, 164 Ariz. 329, 335–36, 793 P.2d 86, 92–93 (App.1989); *Alvarado*, 158 Ariz. at 93, 761 P.2d at 167. The deposition was not taken in compliance with rule 15.3(d) because Webster was not present at the deposition and did not waive his right to be present, and therefore we find it was error to admit this testimony. *See, e.g., People v. McClendon*, 197 Ill.App.3d 472, 143 Ill.Dec. 856, 863, 554 N.E.2d 791, 798 (1990), citing *Alvarado* as an example of a

state court that has "found a defendant must waive his presence at the deposition prior to its admission." Because we find that admission of the deposition violated Webster's right to be present under rule 15.3(d), we do not reach the constitutional issue of whether admission of the deposition violated his confrontation clause rights. Because we reverse Webster's conviction on other grounds, we will not consider whether this constituted harmless or reversible error.

## DISPOSITION

For the foregoing reasons, we reverse the convictions and death sentences of Grannis and Webster and remand their cases for further proceedings consistent with this opinion.

FELDMAN, C.J., MOELLER, V.C.J., and ZLAKET and MARTONE, JJ., concur.