No. 95,815

STATE OF KANSAS, *Appellee*, v. MARTIN K. MILLER, *Appellant*.
(163 P.3d 267)

Opinion filed July 27, 2007.

*Sarah Ellen Johnson*, of Capital Appellate Defender Office, argued the cause and was on the brief for appellant.

*Charles E. Branson*, district attorney, argued the cause, and *Brenda J. Clary*, assistant district attorney, and *Paul J. Morrison*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Martin Miller appeals from his conviction of first-degree murder for the killing of his wife, claiming that the following errors require reversal of his conviction: (1) the admission of several pieces of evidence whose prejudicial nature outweighed their relevance; (2) the admission of hearsay statements of Laura Cuthbertson regarding her relationship with the defendant; (3) prosecutorial misconduct during closing argument; and (4) cumulative error. We conclude that no reversible error occurred and affirm.

Facts

The defendant placed a 911 call to the police on the morning of July 28, 2004, stating that he had found his wife, Mary, dead in her bed. He explained that she was not breathing and that her body was cold. Police arrived at the house around 6 a.m. and determined that Mary was dead and had been so for some time.

A police officer informed the defendant that Mary was dead and observed as the defendant related the news to his 14-year-old daughter, Melodie. According to the officer, Melodie stated that she had awoken to hear her mother scream during the night and had heard the defendant's voice calming Mary down. The defendant denied that it was his voice. At this point, the officers treated the case as suspicious and separated the defendant, Melodie, and the defendant's son, Matthew, so they could be interviewed.

The defendant told the police that he went to bed around 11 p.m. the night before and that his wife joined him after he went to sleep. He got out of bed around 2 a.m. with a headache and pain in his hip. He took an aspirin, went to sleep in the living room recliner, and did not wake up until the morning when he heard Mary's alarm clock going off in the bedroom. He did not attempt to resuscitate her, but instead called the police.

The detective interviewing the defendant asked him about his relationship with Mary, and the defendant told him that they never fought and that their relationship was in good standing. He also gave his consent to the detective's search of his computers.

There were no signs of a struggle in the Miller house or bedroom and no signs of a forced entry.

Melodie testified at trial that she was up until midnight on that night working on her computer, though both of her parents thought she was in bed. She heard the sounds of someone getting up and hurried to her bedroom; she assumed the person stirring was the defendant, who often slept in the living room. She pretended to be asleep while a person (who she believed was her dad) looked in on her. She heard someone boot up the computer down the hall, and then she fell asleep.

Melodie testified that she next was awakened from her sleep when she heard Mary "screaming but not like the high-pitch scream. It was muffled." She was going to go check on Mary, but she heard her father's voice trying to calm her down. Melodie stated that she assumed her mom was having a nightmare and thought things were fine when she heard the defendant's voice.

Melodie was next awakened to the sounds of police sirens. When she got out of bed, she asked her brother Matthew whether he heard the screams, and he told her that he did. She asked the defendant whether he had heard Mary during the night, and he said he did not, since he was asleep in the living room. Melodie stated that later that day, the defendant took her and her brother aside and explained that there were " 'three possibilities for what's going to happen or how they are going to say your mother died' "—that someone broke into the house and killed her, that she died of natural causes, or that the defendant killed her. Melodie said that her father told them that it

was "most likely the police will say he [the defendant] did it because the police just want to find someone."

Melodie also testified regarding the defendant's relationship with a woman named Carrie Parbs. She explained that the defendant would often talk with Parbs on the telephone in his carpentry shop or go visit Parbs in Eudora to swim in the pool in her apartment complex. Melodie was concerned that her father and Parbs' relationship was "more than a friendship" because "she flirted with him and . . . he kind of flirted back." (When asked about Parbs on the day after Mary's death, the defendant told the interviewing detective that he did have a relationship with her but that it had ended the previous fall.)

Matthew testified at trial that he also heard his mother make "a raspy like—yell, like where she couldn't get any air in." He explained that it "sound[ed] like she was having a hard time breathing" and that he had never heard his mother make a sound like that before. Matthew testified that after he heard the noise from his mother, he heard his father's voice saying, " 'Calm down. Calm down. Everything's going to be alright.' "

The defendant elected to testify in his own defense. He stated that he went to bed around 11 p.m. but woke up around midnight in pain. He looked in on Melodie and turned off Melodie's laptop. He then went to the kitchen for medicine and sat down at his computer while he waited for the medication to take its effect. When it had done so, he went to the recliner in the living room and went to sleep.

The defendant testified that he woke up again sometime around 3 a.m. because he had to use the restroom. He went to the master bathroom and fell asleep on the toilet, when he awoke to Mary making "an outburst of sound." He went to her and touched her, telling her to calm down and breathe. When her breathing went back to normal, he thought everything was okay and went back to the living room to go to sleep.

The coroner who first examined Mary at her home and later performed the autopsy also testified at trial. He noted that there was no indication of sexual assault and no injury to Mary's hands. However, he noted that there was petechiae in Mary's eyes and

pulmonary edema foam coming from Mary's nose. During the autopsy's internal examination, he noticed a flame hemorrhage in the sternohyoid muscle over the thyroid, which indicated an applied injury to the neck, and another area of hemorrhage on the superior horn of Mary's thyroid cartilage, which could only be caused by pressure applied to the neck. The coroner also explained that he observed bruises to Mary's scalp, showing that force had been applied in that area within a day or two of death. He found no evidence of other injury, trauma, disease, drugs, or poison. The coroner concluded that Mary died from asphyxiation by strangulation.

An examination of defendant's computer revealed 6,801 images that the examiner described as "pornographic," organized into 29 different folders and one folder of unsorted images and labeled according to the type of activity portrayed. The computer also contained a program called "Magic Folders," which the defendant told the detective that he used to hide pornography. Searching this program revealed another 2,000 to 2,500 pornographic images, as well as 291 videos. It also revealed the defendant's memberships at several Internet dating websites, with profiles active until the day before Mary's death.

The examination of the computer also revealed several photographs of the defendant and Parbs together, as well as a document entitled " 'Marriage Dairy [sic],' " where the defendant stated that he regretted ever marrying Mary and articulated his frustration with that relationship, and an undated letter from the defendant to Parbs. In the letter, the defendant expressed his love for Parbs but said that being exposed in an adulterous affair would destroy both himself and her. The letter concludes with the defendant stating that he and Parbs will be together in the future "when the time is right." Both of these documents were admitted into evidence.

In addition to these documents and images, the forensic examination of the defendant's computer also showed that the defendant had received numerous e-mails from Parbs, including one sent a little more than 24 hours before Mary's death. In this e-mail, titled " 'instincts,' " Parbs told the defendant that Mary had almost

caught the two of them hugging and kissing in the defendant's shop when Mary arrived home that evening.

Finally, the search of the computer revealed that between 12:48 a.m. and 12:51 a.m. on July 28, 2004, someone using the defendant's computer conducted Internet searches using the terms "sleep patterns" and "deep sleep patterns."

The State's theory of the case was that the defendant had been living a "double life" before Mary's death. To the public, he was a family man active in his church and his children's school. Privately, however, the defendant was extremely unhappy with his marriage, was obsessed with pornography, had been involved in an extra-marital sexual relationship with Parbs for 4 years, and was active on a number of Internet dating sites. To establish the defendant's motive in killing Mary to pursue this "other life," the State sought to offer as evidence a few of the pornographic photographs and photographs of the defendant and Parbs as representative of the defendant's collection, as well as a number of documents written by the defendant, correspondence between the defendant and Parbs, and the defendant's profiles on the Internet dating sites.

Prior to trial, defense counsel sought to limit the number of commercial pornographic images admitted so as to prevent unfair prejudice. The court directed the State to select the images that it planned to use and provide them in advance to the defense, and to do the same with any autopsy photographs that would be used. In addition, the defendant sought to exclude images of Parbs and himself; noting that some of the images would be relevant to demonstrate the severity of the defendant and Parbs' relationship, the court told the defendant's counsel to work with the prosecutor to choose which images should be used in advance and to object at trial if and when "enough is enough."

The defendant also sought to exclude evidence regarding his relationship with Laura Cuthbertson, a member of his church who acted as his "caregiver" after Mary's death, and a "Dream of Roses" letter Miller had written regarding a dream he had involving Parbs, Mary, and Cuthbertson. Defense counsel objected to Cuthbertson's testimony regarding the dream letter and again objected based on relevance when Parbs testified regarding the letter. How-

ever, the court found the letter relevant and ruled it was admissible. Without objection, Parbs also testified that Cuthbertson told her that Cuthbertson loved the defendant and that he loved her back.

Discussion

(1) ADMISSION OF EVIDENCE

The defendant argues that the trial court erred by admitting various pieces of evidence throughout the course of the trial relating to his pornography collection and his relationships with Parbs and Cuthbertson. In particular, the defendant claims that the trial court erroneously admitted (1) two commercial pornographic images obtained from the defendant's computer; (2) four photographs of the defendant in sexually suggestive poses wearing little or no clothing, taken during his relationship with Parbs and also obtained from the defendant's computer; (3) two photographs of the defendant and Parbs partially clothed and in sexually suggestive positions, obtained from Parbs; (4) evidence of the defendant's relationship with Cuthbertson, which started after his wife's death, and (5) the "Dream of Roses" letter. The defendant claims that this evidence was highly prejudicial and of limited probative value, such that the trial court's admission of the evidence constituted reversible error.

*Standard of Review*

Recently, we explained that "[o]nce relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question." *In re J.D.C.*, 284 Kan. 155, Syl. ¶ 1, 159 P.3d 974 (2007). Furthermore:

"The appropriate exercise of judicial discretion varies, depending on the character of the question presented for determination. A district court's decision is protected if reasonable persons could differ about the propriety of the decision, as long as it was made within and took into account the applicable legal standards. If, among other things, a district court's decision goes outside the legal framework or fails to properly consider statutory limitations, it constitutes an abuse of discretion." *In re J.D.C.*, 284 Kan. 155, Syl. ¶ 3.

See also *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005) (quoting *Koon v. United States*, 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 [1996]). "An appellate court's review of questions of law is unlimited." *In re J.D.C.*, 284 Kan. 155, Syl. ¶ 2.

*Relevance of Evidence Generally*

K.S.A. 60-407 states that "[e]xcept as otherwise provided by statute . . . (f) all relevant evidence is admissible." " 'Relevant evidence' " is defined by K.S.A. 60-401(b) as "evidence having any tendency in reason to prove any material fact." Kansas courts have held that " ' "[t]he determination of relevancy is a matter of logic and experience, not a matter of law. [Citations omitted.]" ' " *State v. Gardner*, 264 Kan. 95, 104, 955 P.2d 1199 (1998). Therefore " ' "when a physical object is offered into evidence and a question arises as to its connection with either the defendant or the crime charged, unless it is clearly irrelevant, the object should be admitted for such weight and effect as the jury sees fit to give it." ' [Citations omitted.]" 264 Kan. at 104. We have also explained:

" 'For evidence to be admissible in the trial of a case it must be confined to the issues, but it need not bear directly upon them. To render evidence of collateral facts competent, there must be some natural, necessary or logical connection between them and the inference or result which they are designed to establish.' " *State v. Gauger*, 200 Kan. 563, 565, 438 P.2d 463 (1968) (quoting *In re Estate of Isom*, 193 Kan. 357, Syl. ¶ 2, 394 P.2d 21 [1964]).

As indicated above, the admission or exclusion of evidence lies within the sound discretion of the trial court. If the trial court determines the probative value of the evidence offered is substantially outweighed by the risk of unfair prejudice, the court may exclude relevant evidence. *State v. Leitner*, 272 Kan. 398, 415, 34 P.3d 42 (2001).

At the same time, the law in this state favors the admission of otherwise relevant evidence. See *Gardner*, 264 Kan. at 104; *Gauger*, 200 Kan. at 565-66. The Court of Appeals for the Tenth Circuit has explained with regard to Rule 403 of the Federal Rules of Evidence (which has similar language to K.S.A. 60-445 and that used in *Leitner*, 272 Kan. at 415) that "[t]he exclusion of relevant evidence under Rule 403 is 'an extraordinary remedy to be used

sparingly.' " *K-B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1155 (10th Cir. 1985) (quoting *United States v. Plotke*, 725 F.2d 1303, 1308 [11th Cir.], *cert. denied* 469 U.S. 843 [1984]).

In *Leitner*, 272 Kan. 398, we were confronted with an example of evidence that was so lacking in probative value and yet so prejudicial to the defendant that the admission of the evidence was held reversible error. Leitner was convicted of first-degree murder for the death of her ex-husband. The evidence showed that Leitner had shot her ex-husband once in the back of the head and twice more in the temple out of frustration from their divorce, fear of physical abuse, and need for his life insurance proceeds. 272 Kan. at 402-06. Leitner testified in her own defense at trial and described at length the nature of her marriage with her ex-husband and the beatings and abuse he inflicted upon her. See 272 Kan. at 409.

The State sought to cross-examine Leitner regarding her practice of Wicca, a pagan religion, arguing that it was relevant in that it was her husband's dislike of the religion that often caused him to beat her. 272 Kan. at 410. The trial court recognized the highly prejudicial nature of this evidence but reluctantly allowed the State to cross-examine Leitner on her involvement with Wicca, finding that her testimony "open[ed] the door" to inquiry. 272 Kan. at 410-11.

On appeal, this court found the admission of the evidence relating to Leitner's practice of Wicca to be error. The court noted that "the evidence showing that Leitner participated in Wicca bears no relevance to the crimes charged against her. The record contains no hint or innuendo that her abstract beliefs had any connection to Leitner killing Michael." 272 Kan. at 415. Furthermore, the court found the evidence to be "highly prejudicial," explaining that "the idea of witchcraft has generated terror and contempt throughout American history." 272 Kan. at 415-16. This court therefore held that "because the evidence of Leitner's practice of witchcraft was more prejudicial than probative, had no direct relevance to the crime charged, and did not serve to impeach Leitner, no reasonable person would take the view adopted by the trial court in admitting evidence of Leitner's participation in witchcraft. The

decision to admit this evidence at trial was in error." 272 Kan. at 416. However, the court concluded that the admission into evidence of the defendant's involvement with Wicca was harmless in light of the "overwhelming evidence" against her. 272 Kan. at 416-18.

In *State v. Morfitt*, 25 Kan. App. 2d 8, 9, 956 P.2d 719, *rev. denied* 265 Kan. 888 (1998), the defendant appealed from his convictions of attempted second-degree murder, aggravated kidnapping, aggravated indecent liberties with a child, and aggravated battery. Relevant to this discussion, the Court of Appeals considered whether the district court erred in admitting an ice pick, condoms, and "sexual devices" that had been recovered from Morfitt's car. 25 Kan. App. 2d at 16-17. The State argued that the items were properly admitted as res gestae evidence, contending that "because Morfitt was charged with premeditated attempted murder and a sexual crime, anything that could have been used as a weapon or anything relating to sex would somehow have sufficient relevance to substantiate the connection." 25 Kan. App. 2d at 17.

The *Morfitt* court rejected this argument, finding that "[t]here was no indication that [the defendant] used any of the items taken from his car during the perpetration of the crimes, and the State did not attempt to argue that Morfitt brought the items with him with the intent to use them on [the victim]." 25 Kan. App. 2d at 18. The court further noted that "none of the sexual items involved child pornography or would otherwise have probative value." 25 Kan. App. 2d at 18. Because "[t]he evidence was not part of the crimes charged and had no tendency to prove a material fact," the court found the admission of the evidence found in Morfitt's car was error. To hold otherwise, the court explained, would require an " 'unrealistic leap of faith.' " 25 Kan. App. 2d at 19 (quoting *State v. Bornholdt*, 261 Kan. 644, 660, 932 P.2d 964 [1997]).

Both *Leitner* and *Morfitt* involved evidence that bore little if any relevance to the charges against the respective defendants. Nevertheless, the evidence admitted—whether the statements describing participation in "witchcraft" in *Leitner* or the various sexual devices in *Morfitt*—was extremely prejudicial to each defendant. Thus, the probative value of the evidence was "substantially out-

weighed" by the evidence's prejudicial effect. See K.S.A. 60-445. Under such circumstances, both the Kansas Supreme Court and Court of Appeals acknowledged that the trial court abused its discretion in admitting such evidence.

With these statutes and cases as background, we now turn to the evidence admitted in this case—the photographs, the evidence of the defendant's relationship with Parbs, and the "Dream of Roses" letter.

## (A) *Photographic Evidence*

The defendant claims that the trial court erred in admitting eight photographs into evidence: Exhibits 44 and 47, commercial pornographic photographs from the defendant's computer collection, both of which portray a man and a woman having intercourse with exposed genitalia; Exhibits 48 through 51, photographs of the defendant alone from his computer collection, which portray the defendant in very little or no clothing in suggestive poses; and Exhibits 61 and 62, photographs of the defendant and Parbs from Parbs' collection, which show the defendant and Parbs semi-nude in sexually suggestive poses, though not actually having intercourse. The defendant argues that these photographs were highly prejudicial and had little if any probative value; he also argues that the photographs were cumulative in that the substance of the photographs was already before the jury by way of witnesses' testimony, and the actual photographs served only to inflame the jury.

The State counters that the photographs were relevant in order to prove its theory of the defendant's motive and intent. The State points out that its theory of the case centered on the fact that the defendant was leading a "double life"—his public life with his wife and kids and his "secret" life with his affair and pornography obsession. According to the State, the photographs admitted were demonstrative of this theory and provided a better understanding than the testimony alone.

The State also responds that the defendant's only objection to the admission of the photographs during its pretrial motions and contemporaneous objections at trial was that the admission of all of the photographs would become cumulative to the point of their

prejudice outweighing their probative value. The State argues that both the prosecution and defense counsel worked together before trial to limit the number of photographs that would be shown. Thus, the State moved to admit only two out of roughly 8,000 pornographic images found on the defendant's computer, and six out of thousands of pictures from the defendant and Parbs' sexual encounters. Moreover, the State argues that it attempted to minimize the embarrassment caused to the defendant by showing only two of the pictures (both of which were of the defendant alone) on the overhead and publishing the remaining six photographs to the jury without showing the entire courtroom.

### Specific Objection Requirement

Before analyzing whether it was error to admit the eight photographs in question, we consider the State's argument that the defendant's counsel failed to lodge a specific objection to the admission of the photographs at trial. A party must make a timely and specific objection to the admission of evidence at trial in order to preserve the issue for appeal. K.S.A. 60-404; *State v. Sims*, 265 Kan. 166, 174, 960 P.2d 1271 (1998).

The State claims that the defendant failed to specifically object to the admission of the photographs at trial and so is precluded from arguing that issue before this court. Although the State acknowledges that the defendant's counsel objected to the admission of the photographs at trial based on the defendant's pretrial motions in limine, the State asserts that these objections were pro forma given the cooperation between the State and the defendant's counsel in limiting the number of photographs to be shown.

The defendant filed several motions in limine prior to trial, attempting to limit the evidence that would be admitted. Relevant here, the defendant filed one motion to limit the testimony of Detective Slifer and another to limit the testimony of Parbs; the essence of these motions was that the defendant and his counsel anticipated that the State would seek to admit numerous photographs of an embarrassing and pornographic nature in conjunction with the testimony. The defendant's motions sought therefore to limit the number of commercial pornographic images admitted

from his computer and to exclude photographs of the defendant and Parbs.

Our review of the defendant's motions in limine and related objections at trial shows that it is unclear whether the defendant has properly preserved this issue for appeal. It appears from the record that the defendant was concerned with the prejudice associated with the wholesale admission of the thousands of commercial pornographic photographs and the numerous suggestive photographs of the defendant and Parbs. Defense counsel therefore sought to limit the number of photographs admitted, not to exclude all photographic evidence. The State's view finds further support in defense counsel's argument during the hearing on the pretrial motions, where defense counsel recognized that some photographs might come in, but admissions of "numerous photographs . . . becomes at a certain point prejudicial." In addition, defense counsel worked with the State to select the photographs that would be admitted at trial in order to minimize undue prejudice to the defendant.

These circumstances present a very close case as to whether we should review the defendant's claim regarding the photographic evidence or dismiss the claim for failure to properly preserve the issue. However, the defendant did contest the admission of the photographs in his pretrial motions and referenced those motions during his contemporaneous objections at trial. Under these circumstances, we choose to address the merits of the defendant's claim.

### Admissibility of the Photographs

In *State v. Mayberry*, 248 Kan. 369, 383, 807 P.2d 86 (1991), we considered the admissibility of photographic evidence, explaining that "[p]hotographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence. [Citation omitted.] Nevertheless, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue." See *State v. Stone*, 253 Kan. 105, 110-12, 853 P.2d 662 (1993). To determine whether the trial court

abused its discretion in admitting the photographs, we must resolve two questions: (1) Were the photographs relevant? and (2) If the photographs were relevant, did the prejudicial nature of the photographs substantially outweigh their probative value? See *State v. Hickles*, 261 Kan. 74, 85-87, 929 P.2d 141 (1996).

Like other evidence offered at trial, photographic evidence is relevant and generally admissible if the photographs "[have] a reasonable tendency to prove a material fact" in the case. *Mayberry*, 248 Kan. at 384. For this reason, demonstrative photographs that serve to better illustrate a witness' testimony to the jury are admissible when the photographs themselves, if viewed in a vacuum, would be otherwise objectionable. See *State v. Parker*, 277 Kan. 838, 847, 89 P.3d 622 (2004) (" ' "[p]hotographs which are relevant and material in assisting the jury's understanding of medical testimony are admissible" ' "). "The trial court has broad discretion regarding the admission of relevant demonstrative photographs. To determine whether such photographs should be admitted, a trial court must decide whether they are relevant and a proper foundation has been laid. [Citation omitted.]" *State v. Groschang*, 272 Kan. 652, 667, 36 P.3d 231 (2001).

For example, we have held that despite their sometimes gruesome nature, " 'photographs which aid a pathologist in explaining the cause of death are admissible.' " *State v. Cavaness*, 278 Kan. 469, 477, 101 P.3d 717 (2004) (quoting *Parker*, 277 Kan. 838, Syl. ¶ 5). Nevertheless, we have also held that admission of such photographs is error when the photographs do not help explain or supplement testimony, but rather serve to "inflame the minds of the members of the jury." *State v. Boyd*, 216 Kan. 373, 377, 532 P.2d 1064 (1975).

In *Hickles*, 261 Kan. 74, this court considered whether several photographs introduced at trial were "unduly prejudicial and fundamentally unfair" due to their gruesome nature; in other words, we considered whether the photographs' prejudice outweighed their probative value. 261 Kan. at 85. In particular, Hickles contended that the trial court erred in admitting 25 photographs of the autopsy when the defendant received 13 wounds, and that the

number of photographs admitted (over 100) was cumulative and therefore error. 261 Kan. at 85-88.

The *Hickles* court concluded that the trial court did not abuse its discretion in admitting the photographs in question. While *Hickles* noted that "[p]hotographs are unduly prejudicial and are erroneously admitted when they are unduly repetitious, are particularly gruesome, and add nothing to the State's case," the court found that the photographs were relevant and that "none [of the autopsy photographs] is particularly gruesome or unduly prejudicial." 261 Kan. at 85, 87. In addition, the court held that the cumulative nature of the photographs (which supplemented expert testimony and other evidence admitted at trial) was not in itself a reason for reversal. 261 Kan. at 88.

The defendant cites three cases in support of his contention that the photographs in this case were erroneously admitted: *Taylor v. State*, 93 S.W.3d 487 (Tex. App. 2002); *State v. Grannis*, 183 Ariz. 52, 900 P.2d 1 (1995); and *State v. Glassburn-Hoesli*, No. 89,441, unpublished opinion of the Kansas Court of Appeals filed January 9, 2004, *rev. denied* 278 Kan. 849 (2004). We have reviewed these cases and find them distinguishable from the case presently before us.

*Taylor* involved an appeal by a defendant convicted of nine counts of possession of child pornography. 93 S.W.3d at 493. As one of the issues on appeal, Taylor argued that the trial court committed reversible error when it admitted into evidence a "story" found on a floppy disk in Taylor's residence. The story involved "a despicable (and lengthy) sexual narrative extolling the joys of sex enjoyed by men and women with both willing and unwilling young girls. It [was] extremely graphic and provide[d] detailed descriptions of an infinite variety of sexual activity." 93 S.W.3d at 504.

The Texas Court of Appeals found that the story would have been relevant and admissible "for reasons other than to show Taylor was acting in conformity with his character." 93 S.W.3d at 505. Citing a Fifth Circuit Court of Appeals case, the court explained that such a story

"was admissible as relevant to show that [the defendant] knew the photographs were of minors, that he knowingly possessed the images, that it was [the defend-

ant] instead of another family member who possessed the photographs, and that the possession was likely not an accident when the person was also downloading narratives involving sexual contact between adults and minors. [Citation omitted.]" 93 S.W.3d at 505.

However, despite the story's arguable relevance, the court ultimately held that the "extreme inflammatory nature" of the story, which the court described as "a story about the rape of many children by a number of adults in graphic detail," indicated that the prejudice caused by the story's admission outweighed its probative value. 93 S.W.3d at 506.

In *Grannis*, the defendant was convicted of first-degree murder, theft, and trafficking stolen property. The murder took place at the victim's home in New Mexico, where the victim died after receiving numerous stab wounds and other blunt force trauma. When the police arrested Grannis at his mother's home several months after the murder, they retrieved a number of items from Grannis' closet, including four knives and a switchblade consistent with the victim's wounds, as well as a collection of pornographic homosexual photographs. All of these items, including the photographs, were admitted at trial. The State's reason for offering the photographs into evidence was that a question arose at trial as to whether the deceased victim had tried to force the defendant to engage in homosexual sex with him. 183 Ariz. at 54-56.

Grannis appealed his conviction on the basis that the admission of the homosexual pornographic photographs "lacked probative value and were unduly prejudicial." 183 Ariz. at 56. The Arizona Supreme Court agreed with the defendant, concluding that the photographs "were marginally relevant, but the trial judge abused his discretion by admitting them because their probative value was substantially outweighed by the danger of unfair prejudice." 183 Ariz. at 57.

In particular, the court noted that the probative value of the photographs was limited, while the danger of unfair prejudice was high. The court explained that "[i]n conjunction with [the defendant's] testimony" regarding his past homosexual experiences and the victim's alleged advances prior to his death, "the photographs added very little to the jury's understanding of the issues." 183 Ariz.

at 57. Moreover, the court found that "[t]he graphic images of males involved in homosexual acts would likely have repulsed many of the jurors. The jurors' verdict may well have been improperly influenced by their revulsion and not entirely based on a belief that the state proved the elements of the crime." 183 Ariz. at 57. In light of these findings, the Arizona court held that the trial court's admission of the photographs constituted reversible error. 183 Ariz. at 57.

Finally, in *Glassburn-Hoesli*, a securities case where the defendant and the victim were involved in a dominant-submissive sexual relationship, the Kansas Court of Appeals considered whether the district court erred when it denied the defendant's request to present additional evidence relating to the sexual relationship, including photographs and other evidence. The court noted that "the defendant was allowed to describe the extreme dominant-submissive sexual relationship in great detail." Slip op. at 7. The court found that

"[t]he jury undoubtedly had a very clear picture of the bizarre sexual relationship between the defendant and [the victim]. We find no abuse of discretion in the district court's decision not to allow the additional evidence to come before the jury. The evidence was cumulative and had little additional relevance to evidence already heard by the jury." Slip op. at 7.

The defendant contends that the two out-of-state cases stand for the proposition that unfair prejudice associated with photographs of a sexual nature outweighs such photographs' probative value and are cause for reversal. He cites *Glassburn-Hoesli* for the notion that a district court may, in its exercise of discretion, choose to limit the admission of sexually graphic evidence even where such evidence may be relevant.

Contrary to the defendant's argument, the court in *Glassburn-Hoesli* merely affirmed a court's discretion to exclude additional evidence; it did not hold that the court was required to do so. This reasoning is fully in keeping with our previous decisions, which have found that although "[t]here are instances when the trial court may in the exercise of its discretion refuse to admit testimony which is cumulative," cumulative evidence is not itself objectionable. *Hic-*

*kles*, 261 Kan. at 88. We find that the *Glassburn-Hoesli* language has no bearing on the case presently before us.

In this case, the State's theory was that the defendant's motive behind killing his wife was based on his leading a "double life"— on the one hand, a family man actively involved in his church and his children's school, and on the other hand, a man who downloaded thousands of pornographic images and was engaged in a 4-year extramarital affair that was very sexual in nature. To this end, the State introduced evidence of e-mails between the defendant and Parbs and the " 'Marriage Dairy [*sic*]' " in which the defendant claimed that his marriage did not satisfy his sexual desires. In addition, the State offered an e-mail from Parbs to the defendant 2 days before his wife's death, where Parbs stated that she thought Mary had seen the defendant and Parbs together at the defendant's shop earlier in the day. The State also introduced evidence that Parbs had attempted to persuade the defendant to divorce his wife and marry her, but he had responded that he could not allow news of their relationship or the nature of that relationship to be made public.

Under these circumstances, the State introduced the six personal photographs of the defendant and Parbs and the two commercial pornographic photographs from the defendant's collection.

Having reviewed the record in this case, we conclude that the six personal photographs, which depicted the defendant or the defendant and Parbs semi-nude in suggestive positions, were relevant under the State's theory of the case to the issues of motive and intent. The photographs illustrate the intensity and nature of the defendant's post-marital relationship and provide a sharp contrast with the evidence regarding the defendant's marriage. The district court did not abuse its discretion in concluding that the defendant's personal photographs had "a reasonable tendency to prove a material fact" in the case. *Mayberry*, 248 Kan. at 384.

Moreover, contrary to the defendant's assertions, the six personal photographs were not introduced solely to demean or embarrass the defendant. These photographs are not extraordinarily graphic. They are therefore distinguishable from the evidence in *Taylor* and *Grannis*, where the courts noted that the *extreme* sexual

character of the evidence in question (the story detailing the rape of young girls) or the social prejudice that may spring from such evidence (the homosexual pornography collection) rendered the evidence so prejudicial to call for reversal. The personal photographs here were not of that extreme character. In addition, though many people would disapprove of the defendant's extramarital affair, evidence of that affair was relevant to prove motive, and testimony regarding the affair had already been admitted without objection, mitigating the photographs' prejudicial effect. The case is therefore distinguishable from this court's decision in *Leitner*, where "the evidence of Leitner's practice of witchcraft was more prejudicial than probative" and "had no direct relevance to the crime charged." 272 Kan. at 416. We find that the district court did not abuse its discretion in admitting these six photographs.

The two commercial pornographic photographs, however, require a different analysis. The State claims that these photographs, which depicted a male and a female with exposed genitalia engaging in various acts of sexual intercourse, were relevant to illustrate the nature of the photographs contained in the defendant's pornography collection. Nevertheless, we find that the connection between the defendant's commercial pornography collection and his desire to murder his wife is tenuous at best. Furthermore, we note that two police officers testified at length regarding the nature and extent of the defendant's collection of pornographic images and videos. While the defendant does not argue that this testimony was irrelevant or improperly admitted, we cannot conclude that these two particular images, which are quite graphic, provided the jury with any greater understanding of the defendant's collection than the testimony itself. To hold that the two commercial photographs are logically connected to the material facts of this case requires an " 'unrealistic leap of faith.' " *Morfitt*, 25 Kan. App. 2d at 19 (quoting *Bornholdt*, 261 Kan. at 660).

Moreover, given the graphic nature of the commercial pornographic photographs, we conclude that this limited relevance was substantially outweighed by the potential for undue prejudice. It is true that only two photographs (out of about 8,000) were offered to illustrate the types of pornography found on the defendant's

computer, and police officers had already testified in great detail without objection to the extent and organization of the defendant's pornography collection. Nevertheless, like the problematic photographs in *Grannis*, the commercial images here "added very little to the jury's understanding of the issues," and their graphic depictions of sexual acts "would likely have repulsed many of the jurors." 183 Ariz. at 57. The district court therefore abused its discretion when it admitted the two commercial photographs.

Nevertheless, even where the trial court erroneously admits evidence against a defendant, an appellate court must determine whether the error is harmless or requires reversal. In *Leitner*, we quoted at length from our discussion in *State v. Clark*, 261 Kan. 460, 469, 931 P.2d 664 (1997):

" 'An appellate court's review of the trial court's admission of evidence is a two-step process. First, it must determine whether the evidence was admissible or inadmissible. Then, if the evidence was improperly admitted, it must determine whether to apply the harmless error rule of review or the federal constitutional error rule to the erroneous admission of that evidence.' [Citation omitted.]

" 'Review of the admission or the exclusion of evidence is usually governed by the harmless error rule. K.S.A. 60-261 provides that no error in either the admission or the exclusion of evidence by the court is a ground for granting a new trial or for setting aside a verdict unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. [Citation omitted.]

" 'Under the federal constitutional error rule, an error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. [Citation omitted.]' " 272 Kan. at 416-17.

As in *Leitner*, we conclude that it matters little which harmless error test we apply in this case, because other evidence against the defendant is "overwhelming." See *Leitner*, 272 Kan. at 417-18. The defendant was very unhappy with his marriage and was involved in an intense, 4-year extramarital affair. In addition, the defendant was aware that his wife may have seen him with Parbs only 2 days earlier. The night of his wife's death, the defendant ran two Internet searches for "sleep patterns" and "deep sleep patterns."

Both of his children testified that they heard a sound from their mother like a muffled scream and heard the defendant's voice trying to calm his wife down. There was no forced entry into the home. In light of the overwhelming evidence against the defendant in this case, we conclude that the district court's abuse of discretion in admitting the two commercial pornographic images was harmless beyond a reasonable doubt.

Finally, we note that any prejudice to the defendant from the admission of the photographs was mitigated by the defense counsel's cooperation with the prosecutor in selecting the photographs to be admitted in this case. The defense counsel worked with the prosecutor prior to trial in order to limit the number of photographs admitted, both commercial and personal, and choose which photographs should be used. Defense counsel recognized during the hearing in his motion in limine that some photographs would be admitted, but stated that the admission of "numerous photographs I think becomes at a certain point prejudicial." Here, the trial court did not admit numerous photographs; it admitted eight out of thousands, and the eight photographs were selected in part with input from the defendant's attorney.

In order to demonstrate that the district court abused its discretion in admitting the photographs, it is not enough for the defendant to show that photographs were prejudicial. They were undoubtedly prejudicial, as is most evidence introduced by the State at a murder trial. Rather, the defendant must demonstrate that the photographs' probative value was *substantially outweighed* by their unfair prejudice. After reviewing the record in this case, we conclude that the district court did not abuse its discretion in admitting the six personal photographs, and although the district court did err in admitting the two commercial photographs, this error was harmless and does not require reversal.

### (B) *Evidence of the Defendant's Relationship with Cuthbertson*

The defendant also contends that the trial court erroneously allowed Parbs to testify, as a witness for the State, to the effect that Cuthbertson and the defendant became romantically involved after Mary's murder and after Parbs and the defendant's relationship

ended. Parbs testified that Cuthbertson was working with Parbs to help her "purge herself" of her attachment to the defendant after their relationship had ended and explained that on one occasion, Parbs

"asked [Cuthbertson] if she loved [the defendant] and she said, 'Yes, I love him very much.' And I asked whether he had said 'I love you' to her and she said, 'Yes, he has.' And I said, 'Oh Laura, can't you see he's going to hurt you just like he's hurt me,' and she said, 'But he tells me I'm beautiful.' And she cried and I said, 'You are beautiful,' and she said, 'I love him.' "

The defendant claims that this testimony was irrelevant and was unduly prejudicial, since Cuthbertson was a friend and a member of his church.

Despite the defendant's claims on appeal, the defendant failed to preserve this issue for review because he never objected to Parbs' testimony regarding Cuthbertson's statements at trial. Although defense counsel objected to the State's previous questions during *Cuthbertson's* direct testimony regarding her relationship with the defendant based on relevance, defense counsel did not object at all, on relevance or any other basis, to Parbs' testimony regarding this conversation with Cuthbertson. A party must make a timely and specific objection to the admission of evidence at trial in order to preserve the issue for appeal. K.S.A. 60-404; *State v. Sims*, 265 Kan. at 174. Here, where no objection was raised, the defendant may not now claim prejudice on appeal.

Moreover, the defendant fails to demonstrate why such evidence was irrelevant, except that the relationship did not begin "in earnest" until after his wife's death. The State claims that evidence of Cuthbertson's relationship with the defendant was relevant in order to further demonstrate its "double life" theory, in that the defendant's "pattern of conduct continued unabated and unaltered beyond Mary Miller's death." We agree. The State argues that the mere fact that Cuthbertson was a member of the defendant's church does not render evidence of their relationship so prejudicial as to substantially outweigh its relevance to this case. We agree. The defendant has not demonstrated that the district court abused its discretion in allowing Parbs' testimony, and since he did not

object to that testimony at trial, we find that the admission of Parbs' testimony was not error.

*(C) "Dream of Roses" Letter*

The defendant similarly claims that the trial court erred when it admitted into evidence the "Dream of Roses" letter. Parbs testified that Cuthbertson read her this letter, which was written by the defendant about 3 months after his wife's death, in two stages. According to Cuthbertson's and Parbs' testimony regarding the contents of the dream letter, the letter was intended to let Parbs know that her relationship with the defendant was ending (first stage) and that he was beginning a relationship with Cuthbertson (second stage). Defense counsel's contemporaneous objections based on relevance to the admission of the two versions of the letter, as well as Parbs' testimony about the letter, were overruled.

The defendant contends that the dream letter was irrelevant and that it "had the potential to prejudice the jury against Mr. Miller's character" in that it "portrayed Mr. Miller as a womanizer." In addition, the defendant asserts that Parbs started crying during her testimony regarding the letter, and that "the very real possibility exists that the jury may have developed an intense dislike for Mr. Miller."

" 'Relevant evidence' " is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). While it is true that the dream letter tends to emphasize the defendant's relationships with Parbs and Cuthbertson, the letter also contains a paragraph regarding Mary's death. It states that after leaving the "throne" where Parbs was seated, the defendant starts walking down a sidewalk, where

"[a]fter a few paces I become aware of a large stone or concrete box on my left. I sense that this is Mary's box. It is pure white. As I slowly pass the box the lid becomes covered with roses of every color; red, white, peach, yellow, pink etc. The beauty and fragrance is tremendous. There is a light that shines down on the roses, a heavenly light. The emotion is pure joy and exaltation. It is so beautiful. There is a strong sense of forgiveness and release. My feet keep on marching. As the box is swallowed up in the mist I know that I will not see it again."

At this point, the first dream letter ends. The second continues with a discussion of the defendant joining Cuthbertson at her throne.

While we agree with the State that the defendant's dream letter was relevant to show the defendant's motive and intent—like the other evidence discussed previously—we further find that allusion to the defendant's reaction (or lack of reaction) to his wife's death renders the letter relevant in a case where he is charged with causing that death. The dream letter explains that "[t]here is a strong sense of *forgiveness and release*" when the defendant walked by "Mary's box." (Emphasis added.) The trial court did not abuse its discretion when it found the letter to be relevant.

Moreover, the possible prejudicial effect that the dream letter may have had on the jurors—according to the defendant, causing them to dislike him because he was a "womanizer"—does not render the letter inadmissible. The State's theory of the case was that the defendant killed his wife in order to pursue his other lifestyle without the "public scandal" of a divorce. According to the State, the defendant's motive in the murder was a desire to pursue other relationships. We, like the district court, conclude that the prejudicial effect of the letter does not substantially outweigh the letter's relevant nature and does not rise to the level of undue prejudice in *Leitner*, where no reasonable person could take the view of the trial court.

### (2) HEARSAY STATEMENTS OF LAURA CUTHBERTSON

The defendant claims that the trial court erroneously allowed Parbs to testify regarding statements made by Cuthbertson to her to the effect that Cuthbertson was in love with the defendant, in violation of his confrontation rights. Cuthbertson testified at trial, but the content of these statements was first offered in the context of Parbs' testimony.

At trial, when the State asked Cuthbertson questions regarding the nature of her relationship with the defendant, defense counsel objected, claiming that the information was not relevant and was overly prejudicial. The State argued that the information was relevant, in that Parbs would later testify that Cuthbertson told her that Cuthbertson loved the defendant, demonstrating that he continued to live his "double life" according to the State's theory of the case. The court found that it could not yet rule on any objection

to the content of Parbs' testimony "because [it didn't] know what Ms. Parbs [would] say." The State then said that it would make a proffer of Parbs' testimony and keep Cuthbertson subject to recall until after Parbs had testified. The court stated that this was "the better course of action." The court therefore sustained the defendant's objection to Cuthbertson's present testimony, and the State ceased Cuthbertson's direct examination.

After defense counsel's cross-examination of Cuthbertson, the State called Parbs as a witness. Parbs testified in detail about the nature of her relationship with the defendant. She also testified that after the defendant's and her relationship ended after Mary's death, she often talked with Cuthbertson about the defendant in an attempt to "purge" her feelings of him. Parbs explained that on one occasion, Cuthbertson came over to her apartment and read a letter written by the defendant entitled "Dream of Roses," admitted into evidence and discussed previously, which used imagery to describe Parbs as being replaced by Cuthbertson.

After Parbs read the letter at trial, the following exchange took place between Parbs and the prosecutor:

"Q. [Prosecutor:] When you were done reading the letter did you talk to Laura about the letter?
"A. [Parbs:] Yeah.
"Q. What did you say?
"A. I don't know if I remember my exact words because I was pretty upset but I asked her if she loved him and she said, 'Yes, I love him very much.' And I asked whether he had said 'I love you' to her and she said, 'Yes, he has.' And I said, 'Oh Laura, can't you see he's going to hurt you just like he's hurt me,' and she said, 'But he tells me I'm beautiful.' And she cried and I said, 'You are beautiful,' and she said, 'I love him,' and then I started crying and just I couldn't talk to her anymore and she finally said, 'Do you need to be alone,' and I shook my head and she left."

Defense counsel did not object to this testimony.

The State did not recall Cuthbertson. However, the defense called her as its first witness and allowed her to testify in detail regarding the "dream letter" conversation:

"Q. [Defense Counsel:] Did there come a time in your relationship with Ms. Parbs after Mary's death that a discussion was had about something called the dream letter?

"A. Yes, sir.

"Q. Was there a conversation that you recall in which you told Ms. Parbs that you loved Marty?

"A. She asked me do I love him and I answered yes.

"Q. And what else did you say?

"A. And I said I don't know what that means. I had been trying to explain to Carrie what it's like to be a widow and that your heart is very closed off, and so for me that was—I was trying to explain to her that I care about him as my brother in Christ and as a friend. I was hoping that that would comfort her because she was so distraught and wanted to make sure that Marty was not abandoned.

. . . .

"Q. So again just so you can clarify what did you mean by saying to Carrie that you loved Marty?

"A. That I had chosen to move out of the caregiver position into a dedicated friendship.

"Q. Do you recall if you might have told her that Marty had also indicated he loved you?

"A. She asked me, 'Did he say he loves you,' and I said, answered, 'Yes.'

"Q. And what did that mean to you when Marty told you he loved you?

"A. As a care provider, people who are receiving care will often tell you that they love you. That's just simple gratitude.

"Q. To be very blunt has the relationship ever been sexual in any regards?

"A. I am celibate. The last man I had sex with was my husband.

"Q. Do you view this relationship as romantic?

"A. I don't know. I don't know my own heart yet. I'm still emotionally unavailable."

## Standard of Review

This court reviews a trial court's determination that hearsay is admissible under a statutory exception for an abuse of discretion. " 'The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.' " *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005) (quoting *Koon v. United States*, 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 [1996]).

## Analysis

A party must make a timely and specific objection to the admission of evidence at trial in order to preserve the issue for appeal. K.S.A. 60-404; *State v. Sims*, 265 Kan. at 174. This court has previously stated that "[a] party is not permitted to remain silent in

the face of known error, gamble on the verdict, and show his hole card only if he loses." *State v. Buggs*, 219 Kan. 203, 208, 547 P.2d 720 (1976.)

In this case, the trial court sustained defense counsel's objection to the State's direct examination of Cuthbertson regarding her relationship with the defendant. However, defense counsel never objected to Parbs' testimony as to statements allegedly made by Cuthbertson to her regarding Cuthbertson and the defendant's relationship. The effect of defense counsel's failure to object to these statements is compounded by the fact that the admission of hearsay statements is reviewed for an abuse of discretion. Because no objection was made, the trial court had no opportunity to exercise its discretion in determining whether the statements could come in under K.S.A. 60-460. In the absence of such an objection, the issue was not properly preserved for this court's review.

Nevertheless, there are several exceptions to the general rule that an issue not properly preserved below may not be asserted for the first time on appeal. We may elect to review an argument if (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; or (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. *State v. Schroeder*, 279 Kan. 104, 116, 105 P.3d 1237 (2005). We choose to consider the merits of the defendant's claim because we find that a further discussion of the defendant's argument is "necessary to serve the ends of justice," in light of recent developments to the law regarding defendants' confrontation rights.

K.S.A. 60-460(a) provides that hearsay evidence "of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated," is inadmissible, except that a court may admit a "statement previously made by a person who is *present at the hearing and available for cross-examination with respect to the statement and its subject matter*, pro-

vided the statement would be admissible if made by declarant while testifying as a witness." (Emphasis added.)

The defendant relies on this court's decision in *State v. Fisher*, 222 Kan. 76, 82, 563 P.2d 1012 (1977), claiming that if the State wished to have Parbs testify regarding Cuthbertson's statements, the State was required to recall Cuthbertson as a witness in order that defense counsel could cross-examine her. The defendant claims that his counsel's later direct examination of Cuthbertson when she was called as a defense witness failed to adequately protect his interests.

In *Fisher*, the defendant was convicted of indecent liberties with a child and aggravated sodomy. Prior to trial, the victim and her mother both told the authorities that the defendant, the victim's stepfather, had sexually molested her. When the State called the victim at trial, however, she changed her story. Based on its belief that the mother would also deviate from her previous statements, the State sought to have both the victim and her mother declared turncoat witnesses, allowing their previous statements to be introduced instead through the testimony of police officers. 222 Kan. at 77. The victim's mother, Mrs. Fisher, "was available to testify at trial, but was never called." 222 Kan. at 79. The victim "was not recalled for cross-examination" after the officers testified regarding her previous statements. 222 Kan. at 80.

While we upheld the court's ruling regarding the victim's turncoat status in *Fisher*, as she had already testified at trial, the court found that the trial court erred in admitting Mrs. Fisher's hearsay statements, since she did not testify at trial. 222 Kan. at 81-82. We explained that "[f]or reasons of policy and fairness, and to ensure the right of confrontation is not abridged, we hold that in a criminal proceeding the declarant must testify at trial before hearsay evidence may be admitted under K.S.A. 60-460(a)." 222 Kan. at 82. The *Fisher* court further clarified that "for the declarant to be subject to full and effective cross-examination by the defendant, [the declarant] must be called to testify by the state." 222 Kan. at 82.

With regard to the hearsay statements of the alleged victim, who did testify but was not recalled after the officers testified as to her

previous statements, the court came to a different conclusion, explaining:

"[The victim] testified before her hearsay statements were admitted through the testimony of Deputy Preston. The defense counsel could have requested [the victim] be recalled for further cross-examination after Preston's testimony. The right to recall a witness for further cross-examination lies in the sound discretion of the trial court. [Citations omitted.] The language of K.S.A. 60-460(a), 'available for cross-examination with respect to the statement and its subject matter,' clearly warrants recalling a witness for cross-examination on his hearsay statement admitted subsequent to his testifying. Whether a witness is actually cross-examined, the fact the defendant has an opportunity to carry out such an inquiry satisfies the confrontation clause. [Citations omitted.] Hence, we conclude the admission of [the victim]'s hearsay statements did not amount to a denial of the appellant's right to confrontation." 222 Kan. at 82.

We have later clarified that under our holding in *Fisher*, "the failure to . . . call the declarants prior to the admission of their out-of-court statements by other witnesses . . . when the declarants are available and actually testify does not violate the confrontation clause of the Sixth Amendment." *State v. Davis*, 236 Kan. 538, 541, 694 P.2d 418 (1985).

As the *Fisher* and *Davis* opinions illustrate, this court is concerned with allowing the State to introduce hearsay statements of declarants who are otherwise present and available to testify by way of other witnesses' testimony, because the admission of such statements may deprive the defendant of his or her rights under the Confrontation Clause. Although neither case states so explicitly, implicit in *Fisher* and *Davis* is an understanding that the hearsay statements in question implicated the defendants' confrontation rights.

Our analysis under the Confrontation Clause was "substantially alter[ed]" by our recent decision in *State v. Davis*, 283 Kan. 569, 158 P.3d 317 (modified opinion filed March 23, 2007). In that case, the court announced our revised confrontation analysis in the wake of the United States Supreme Court's decision in *Davis v. Washington*, 547 U.S. 813, 165 L. Ed. 2d 224, 126 S. Ct. 2266 (2006). As this court explained:

"After *Davis* [*v. Washington*], the test to determine whether the admission of a hearsay statement violates a defendant's rights under the Confrontation Clause

turns on whether the statement is testimonial. If a statement is found to be testimonial, it must be excluded unless a court finds that the declarant is unavailable as a witness and that the defendant had a prior opportunity to cross-examine the declarant. *Crawford [v. Washington]*, 541 U.S. [36,] 68, [158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004)]. *If a statement is not testimonial, then it does not implicate the Confrontation Clause, and the only consideration before the court is whether it may be admitted under one of the statutory exceptions to Kansas hearsay law.* See *Davis,* 126 S. Ct. at 2273-74. A trial court's determination of whether a statement is admissible under the Kansas hearsay statutes is reviewed by this court for an abuse of discretion, which includes a determination that the trial court's discretion was exercised in light of a correct understanding of the applicable law. [Citations omitted.]" (Emphasis added.) 283 Kan. at 575.

Because this court's analysis in *Fisher* was motivated by Confrontation Clause concerns, the holdings in *Davis v. Washington* and *State v. Davis* indicate that the *Fisher* problem only arises when testimonial hearsay is at issue. The preliminary question that must be answered in this case, therefore, is whether Cuthbertson's statements to Parbs were testimonial.

This court has recently considered what may render a statement testimonial in light of *Davis v. Washington* in *State v. Henderson,* 284 Kan. 267, 160 P.3d 776 (2007). In that case, we explained that "[i]n determining whether a statement is testimonial, an appellate court applies an objective, totality of the circumstances test." 284 Kan. 267, Syl. ¶ 4. We note that the explanation regarding testimonial statements in *Davis v. Washington* is of limited applicability here, as both of the consolidated cases in the Court's most recent confrontation case involved statements provided to police officers and dealt specifically with the issue of when an exchange with the authorities becomes an "interrogation" so as to bring the statements made under the "testimonial" umbrella. See 547 U.S. at 818-21, 822 n.1.

In *State v. Lackey,* 280 Kan. 190, 200, 120 P.3d 332 (2005), this court discussed what rendered a statement "testimonial" in light of *Crawford:*

"Although the *Crawford* Court declined to comprehensively define what was meant by 'testimonial' statements, it did describe one formulation as ' "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." ' [*Crawford,*] 541 U.S. at 51-52. The Court found that '[s]tatements taken by police

officers in the course of interrogations are also testimonial under even a narrow standard,' stressing that various forms of interrogations exist. It concluded that the defendant's wife's recorded statement, knowingly given in response to structured police questioning, qualified as an interrogation under any conceivable definition. 541 U.S. at 52-53 and n.4."

This court was faced with a related issue to this one in *State v. Hernandez*, 284 Kan. 74, 159 P.3d 950 (2007). There, the State offered statements made by the defendant's mother to police officers regarding the defendant's relationship to the victim (that they worked together). In that case, the State conceded the mother's statements were hearsay and that the defendant's mother was not called to testify. The issue of whether her statements were testimonial was not raised, nor was it necessary to discuss the scope of the Confrontation Clause, because the statements were made to police officers during the course of their murder interrogation and were clearly testimonial under the analysis provided by the Court in *Crawford* and *Davis v. Washington*.

In contrast, the statements involved in this case—made by Cuthbertson to Parbs while at Parbs' residence regarding both women's involvement with the defendant—were not testimonial. The statements were not made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 52. Nor were they made in the presence of police officers or other authorities. According to both Parbs and Cuthbertson, this was a very emotional conversation between the two women and was not subject to any of the formalities and procedures otherwise associated with testimonial hearsay. See *Crawford*, 541 U.S. at 68 (explaining that testimonial hearsay applies "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police investigations").

Because the statements by Cuthbertson were not testimonial, they do not implicate the defendant's rights under the Confrontation Clause and are admissible subject to the requirements of the Kansas hearsay statutes. See *Davis*, 283 Kan. at 575.

K.S.A. 60-460(a) provides that hearsay is admissible when it is a "statement previously made by a person who is present at the hear-

ing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness."

Cuthbertson was present and actually testified as a witness twice during the course of the defendant's trial. As this court explained in *Fisher* with regard to the hearsay statements of the victim (which this court found to be admissible):

"The right to recall a witness for further cross-examination lies in the sound discretion of the trial court. [Citations omitted.] The language of K.S.A. 60-460(a), 'available for cross-examination with respect to the statement and its subject matter,' clearly warrants recalling a witness for cross-examination on his hearsay statement admitted subsequent to his testifying." 222 Kan. at 82.

Because Cuthbertson had previously testified at the defendant's trial and was subject to recall by either the State or the defense, her previous statements to Parbs were admissible under K.S.A. 60-460(a).

## (3) Prosecutorial Misconduct

The defendant claims that the prosecutor committed reversible misconduct in closing argument when he referred to the defendant as "the killer" six times during his discussion of premeditation. The defendant cites as improper the following discourse by the prosecutor:

"When did Marty decide he was going to kill his wife? When did Marty decide he was going to kill Mary? He wrote in his marriage diary that he knew it was a mistake a few years after they got married. He knew it was a mistake to marry Mary. Did it start then? He wrote in that marriage diary that he couldn't possibly bear another 20 years with Mary. Did it start then? What do we know? We know at the very least, at the very least, starting in those early morning hours on July 28th when Marty decided to get out of bed after Mary came to bed. We know at the very least when he stuck his foot outside of that bed, he took the first steps of a killer. How did it happen? We don't know for sure. He got out of bed, Mary Miller was laying [*sic*] there asleep. He gets up, he walks out into the hallway. *The killer* looks in on Matthew, Matthew is sleeping quietly on the floor. After all, that's what kids that age do sometimes. *The killer* walks on down the hall, he checks, he looks in on Melodie. Melodie is asleep, at least so he thinks. *The killer* walks on down the hall. He walks into the computer room, does his search. What does he search for? Sleep pattern. Then he searches for deepest sleep pattern. Was this for Mary? Was this for the kids? He wanted to make sure she was asleep, and then he waits. We don't know how long he waits. Now remember, the defense

left it open, there could have been somebody else. But the voice the kids heard was Marty's voice. You can leave that out there until Marty takes the stand and says 'I was there. I was in that room, nobody else did this.' *The killer* walks back down the hall. *The killer* walks into Mary's room, walks up to Mary on the bed. How does he do it? Is it arm around the neck? Does he hold her down underneath the blankets so she can't move? *The killer* has thought this out, except for one thing. Mary wakes up. Mary wakes up and cries out. She doesn't know what's going on. She knows she can't breathe. Somebody is there. So Marty has to do the only thing he can do, 'Shhh, it's all right. Shh, it's okay. Breathe.' " (Emphasis added.)

The defendant acknowledges that "[t]he prosecutor's comments follow Mr. Miller's actions according to his own testimony" in that "Mr. Miller testified about leaving his bedroom, looking in on his children, and searching on his computer." However, the defendant asserts that the prosecutor's comments are unacceptable because the defendant "denied killing his wife." The defendant claims that the prosecutor's statements were misconduct in that they involved impermissible name calling. He also claims that the prosecutor's statements constituted plain error.

### *Standard of Review*

The defendant did not object at any time to the prosecutor's statements during closing argument. However, when a defendant's claim for prosecutorial misconduct implicates his or her right to a fair trial, we review the alleged misconduct under the same analysis, regardless of whether an objection was made. *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261 (2006).

Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. First, an appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, the appellate court decides whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *Swinney*, 280 Kan. at 779. In its plain error analysis, the appellate court considers three factors:

"(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence is of such a

direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors, unless the harmless error tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman* [*v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial)], have been met. [Citations omitted.]" 280 Kan. at 780.

When a defendant claims that a prosecutor committed reversible misconduct, the prejudicial nature of alleged errors are analyzed in the context of the trial record as a whole. *State v. Whitaker*, 255 Kan. 118, 134, 872 P.2d 278 (1994).

*Analysis*

A prosecutor "is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. [Citation omitted.]" *State v. Scott*, 271 Kan. 103, 114, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001). Nevertheless, this court "cannot condone 'the use of epithets which in any way might be construed in derogation of the presumption of innocence which attaches to one on trial for crime.' [Citation omitted.]" *State v. Collins*, 209 Kan. 534, 535, 498 P.2d 103 (1972).

In *Scott*, the prosecutor made the following statement during closing argument in a case for first-degree murder where the victim was beat to death:

"'Remember again, these are the hands of a human being that did this to another human being. Don't get desensitized by just the grotesqueness of it, because almost all of you probably have never seen something like this before. You look at it and just think can a human being do this? *Yeah, you have about eight feet separating you from the hands of a killer right here.*'" 271 Kan. at 114.

In determining whether this statement constituted prosecutorial misconduct, we found that "[c]alling Scott a 'killer' was improper, especially considering Scott did not deny having caused Chappell's death and relied upon a theory of self-defense. The use of the word 'killer' is inflammatory and was outside the scope of evidence upon which the prosecutor is allowed to comment." 271 Kan. at 114. However, the *Scott* court ultimately held that the prosecutor's comment was harmless since it was one isolated incident. In ad-

dition, the court found that there was "no evidence to suggest that there was any 'ill will' on the part of the prosecutor," and "[t]he comment was not so gross and flagrant as to have prejudiced the jury against Scott and deny him a fair trial." 271 Kan. at 115.

Our conclusion in *Scott* that the prosecutor's comment calling the defendant "a killer" was impermissible relied in part on this court's previous decision in *State v. McCray*, 267 Kan. 339, 979 P.2d 134 (1999). In that case, the prosecutor commented during the summary of his closing argument that

" '[s]omeone is responsible for the murder of Onzie. Somebody is, and that somebody, ladies and gentlemen, is only feet from you. That someone as you know is Damon LaShawn McCray. Look at him, ladies and gentlemen, you have to look at him. *That's what a murderer looks like, ladies and gentlemen.*' " (Emphasis added.) 267 Kan. at 347.

This court explained in *McCray* that "[i]t is a well-established rule in this state that error is committed when a prosecutor injects his or her personal opinion into closing argument. [Citation omitted.] The statements made by the prosecutor in this case regarding the prosecutor's personal opinion of the defendant's guilt were error." 267 Kan. at 347. Nevertheless, the *McCray* court held that in light of the record in the case, the error was harmless beyond a reasonable doubt. 267 Kan. at 351.

As in *Scott* and *McCray*, we find that the prosecutor's comments during closing argument in this case, where he referred six times to the defendant as "the killer," were clearly improper. These comments were "inflammatory" and "inject[ed] . . . into closing argument . . . the prosecutor's personal opinion of the defendant's guilt." *Scott*, 271 Kan. at 114; *McCray*, 267 Kan. at 347.

Having determined that the prosecutor's comments were improper and constituted misconduct, we must determine whether the misconduct constitutes plain error under the test articulated most recently by this court in *State v. Anthony*, 282 Kan. 201, 207, 145 P.3d 1 (2006): "(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence was so overwhelming that the misconduct was likely to have little weight in the minds of jurors. [Citations omitted.]" See *Swinney*, 280 Kan. at 779-80.

It is notable that neither the *Scott* nor the *McCray* court found that the comments made in those cases rose to the level of plain error. However, in both cases, the prosecutor referred only once to the defendant as "a killer" or "a murderer." *Scott*, 271 Kan. at 114; *McCray*, 267 Kan. at 347. In the instant case, although within the context of a few sentences, the prosecutor called the defendant "the killer" a total of six times. The effect of the prosecutor's statement in this case is therefore more pronounced than in previous cases dealing with similar language.

The State contends that the prejudicial effect of the prosecutor's statements during closing argument is mitigated by the fact that he made them in the context of his discussion of the evidence in the case, whereas the comments in *Scott* and *McCray* were made in the summary without discussion of the evidence and emphasized the proximity of the defendant to the jury. The State asserts that the comments in *Scott* and *McCray* were more prejudicial than those here because they indicated that the jury was in proximity to a dangerous criminal.

In essence, the State is arguing that the statements in *Scott* and *McCray* were not only improper because they called the defendant a "killer" and "murderer," respectively, but also that the statements implied that the defendant was a threat to the jury and called on the jury to convict the defendant in order to protect themselves. This argument was not raised with regard to these statements during either of the previous cases. Furthermore, the State's argument to this effect is not persuasive in light of the statements themselves, which make no explicit mention of the jury's need to protect themselves. Any implication to that effect is tenuous at best and fails to counter the repetition of the harmful phrase in this case.

In *State v. Pabst*, 268 Kan. 501, 505, 996 P.2d 321 (2000), this court found that the prosecutor committed reversible misconduct when "the prosecutor accused Pabst of lying at least 11 times during closing argument." After determining that the prosecutor's "assertion that Pabst lied was improper," the court considered whether the repeated comments constituted reversible error. 268 Kan. at 506. The court ultimately held that the "cumulative nature of the prosecutor's errors," compounded by the fact that the trial

court overruled an objection to the comments that Pabst was a liar, was reversible since the evidence of premeditation was not overwhelming against him. 268 Kan. at 511-12.

Previous case law indicates that an accumulation of comments that would not individually be cause for reversal may render the comments "gross and flagrant" under the plain error analysis. See *State v. Tosh*, 278 Kan. 83, 94, 91 P.3d 1204 (2004). Here, the prosecutor's repetition of the phrase "the killer" when referring to the defendant compounds the effect of that statement under the first inquiry described in *Anthony*.

Turning to the second inquiry—whether the prosecutor's comments were motivated by "ill will"—we note that Kansas courts have not developed a test for what constitutes "ill will" in cases of prosecutorial misconduct. However, this court has found ill will when the prosecutor's comments were "intentional and not done in good faith." *Tosh*, 278 Kan. at 94. Similarly, the Court of Appeals has stated that a prosecutor demonstrates ill will when the prosecutor continues to make improper comments after the court has sustained the defendant's objection to that behavior or otherwise has instructed the prosecutor to cease in making such comments. *State v. Lockhart*, 24 Kan. App. 2d 488, 492, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997).

In *State v. McHenry*, 276 Kan. 513, 525, 78 P.3d 403 (2003), we discussed whether comments were motivated by "ill will" in the following context:

"In past cases, we have noted a prosecutor's indifference to a court's rulings, mocking of a defendant, or repeated acts of misconduct are evidence of ill will and the lack of such conduct shows that there was no ill will. See, *e.g., State v. Washington*, 275 Kan. 644, 672, 68 P.3d 134 (2003) (few comments in lengthy transcript does not show ill will); *State v. Abu-Fahker*, 274 Kan. 584, 613-15, 56 P.3d 166 (2002) (mocking defendant's accent shows ill will); *State v. Douglas*, 274 Kan. 96, 108, 49 P.3d 446 (2002) [, *cert. denied* 537 U.S. 1198 (2003)] (noting that ill will can be found when prosecutor ignores prior, sustained objection)."

Our analysis of "ill will" in this case presents a very close question. On the one hand, this court has found on previous occasions that it was improper to refer to the defendant during closing argument as "a killer" or "a murderer." While this court has never

held that such conduct is actually reversible, nevertheless the prosecutor should have been aware that such comments were not permitted. Here, the prosecutor referred to the defendant as "the killer" not only once, but six times. However, we have already considered the cumulative effect of the prosecutor's comments in the context of whether the comments were "gross and flagrant." To find that the repetition of the comments also renders the statements acts of ill will would be tantamount to finding that the first two considerations in the plain error analysis are duplicative. We decline to make such a finding.

On the other hand, the prosecutor's comments were made in the context of arguing the evidence in light of the defendant's own testimony of the events that took place the night of Mary Miller's death. There was no mockery or malice in the prosecutor's comments during closing arguments, and the record does not reveal that prosecutor ever stopped during these sentences to point at or otherwise draw attention to the defendant, other than by describing his actions. *Cf. Abu-Fahker*, 274 Kan. at 613-15. Furthermore, the defendant never objected to the prosecutor's comments during closing argument. While the lack of such an objection does not preclude this court from reviewing the prosecutorial misconduct issue, it nevertheless may play into our examination of whether the comments were made out of ill will. See *State v. Douglas*, 274 Kan. 96, 108, 49 P.3d 446 (2002), *cert. denied* 537 U.S. 1198 (2003). Neither the defendant nor the court gave the prosecutor any reason to believe that his comments were unacceptable. Finally, the prosecutor's comments were limited to a few sentences during 45 minutes of closing argument and a week of trial. *Cf. Washington*, 275 Kan. at 672.

Although this is a close case, we conclude that the prosecutor's statements fall short of evidencing ill will toward the defendant.

Finally, our examination of the third inquiry in the plain error analysis—whether the prosecutor's comments were harmless in light of the entire record—reveals that the evidence against the defendant was indeed "overwhelming" in this case and was unaffected by the prosecutor's comments calling the defendant "the killer." In *Pabst*, this court found the prosecutor's comments to be

reversible in light of a lack of evidence to convict the defendant in the absence of the prosecutor's improper statements. 268 Kan. at 511-12. In this case, however, there was ample evidence of the defendant's premeditation. The defendant was very unhappy in his relationship and was aware that Mary may have seen him with Parbs only 2 days earlier. He woke up that night, got out of bed, and ran two searches on the Internet for "sleep patterns" and "deep sleep patterns." Both of his children testified that they heard a sound like a muffled scream during the night and heard the defendant's voice trying to calm his wife down. Although the defendant initially told the police that he was asleep in a chair in the living room all night and never heard Mary wake up or make any noise, he testified at trial that he had fallen asleep in the restroom when he heard her gasp for air. In addition, he testified that no one else was present in the room. The pathologist who performed Mary's autopsy indicated that the bruises along her neck and other various injuries indicated that she had been strangled and had died of asphyxiation. The prosecutor's comments calling the defendant "the killer" could have little if any weight in the jurors' minds in light of the overwhelming evidence against him. We find that the prosecutor's comments were harmless beyond a reasonable doubt.

In light of our assessment and conclusion that the prosecutor's comments were not motivated by ill will, and that the evidence against the defendant was so overwhelming as to render the comments harmless beyond a reasonable doubt, we conclude that the prosecutor's comments, although improper to the point of being "gross and flagrant," did not deny the defendant a fair trial and so do not require reversal.

(4) CUMULATIVE ERROR

The defendant argues that even if the issues raised in his brief do not individually rise to the level of reversible error, the cumulation of those errors denied him the right to a fair trial. "Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial." *State v. Ackward*, 281 Kan.

2, 29, 128 P.3d 382 (2006). We conclude that in light of the record as a whole and the overwhelming evidence against the defendant, the trial errors in this case do not rise to the level of cumulative error.

The defendant's conviction for first-degree murder is affirmed.

LUCKERT, J., concurring: I concur with Justice Davis' opinion in all respects except the conclusion that it was error to admit the two commercial pornographic photographs.

In justifying the conclusion that it was error to admit the photographs, Justice Davis concludes the relevance of the photographs was "tenuous at best." 284 Kan. at 701. Yet, he explains that "the State's theory was that the defendant's motive behind killing his wife was based on his leading a 'double life'—on the one hand, a family man actively involved in his church and his children's school, and on the other hand, *a man who downloaded thousands of pornographic images* and was engaged in a 4-year extramarital affair that was very sexual in nature." (Emphasis added.) 284 Kan. at 700. Justice Davis also notes that "photographic evidence is relevant and generally admissible if the photographs '[have] a reasonable tendency to prove a material fact' in the case." 284 Kan. at 696 (quoting *State v. Mayberry*, 248 Kan. 369, 384, 807 P.2d 86 [1991]).

This double life of pornography, which defendant attempted to hide from his wife, underlies the State's theory regarding the motivation for murder. The pervasiveness of defendant's fixation and the juxtaposition of that fixation to his family life are key to the State's theory. Motive and intent are material facts in the case. Justice Johnson argues the photographs are not relevant because (1) the defendant had accumulated the photographs over a period of time and, therefore, their existence did not directly trigger the act of murder and (2) if the defendant were trying to hide the photographs he would not have committed the crime in a manner that was likely to lead to the discovery of the photographs. These conclusions result from a weighing of the credibility of the State's theory (by assuming the defendant acted logically when planning the murder of his sleeping wife) and ignore the probative value of the photographs in establishing the defendant's secret lifestyle. Our

role is not to weigh the credibility of the evidence. The State is entitled to admit evidence relevant to its theory. Relevancy requires a logical relationship between the evidence and the matter to be proven. It does to require that the matter to be proven be logical.

Interestingly, the defendant does not question the relevancy of the officer's testimony regarding finding the commercial pornography or regarding the extent or nature of the commercial pornography. In fact, Justice Davis even noted: "[T]he defendant does not argue that this testimony was irrelevant or improperly admitted." 284 Kan. at 701. If the testimony was relevant, the photographs relating to and demonstrating the testimony are also relevant. Contrary to the other justices' conclusion, an unrealistic leap of faith is not required to connect the photographs to the material facts in the case. See 284 Kan. at 701.

After noting that the defendant did not object to the relevancy of the officer's testimony, the other justices conclude the photographs add very little to the jury's understanding of the issues and the prejudicial effect of the photographs outweighed the probative value. Justice Davis concedes that the determinations of probativeness and prejudice are areas where "broad" discretion is given the trial court, stating: " 'The trial court has broad discretion regarding the admission of relevant demonstrative photographs.' " 284 Kan. at 696 (quoting *State v. Groschang*, 272 Kan. 652, 667, 36 P.3d 231 [2001]). Generally, we state: "Discretion is abused only when no reasonable person would take the view adopted by the district court." *State v. Moses*, 280 Kan. 939, 945, 127 P.3d 330 (2006). This is not, in my opinion, a situation where we can say that no reasonable person would take the view adopted by the trial court.

The nature of the pornography and the likelihood that it would offend defendant's wife were relevant. Ironically, the more likely it was that the evidence would offend defendant's wife and reflect a lifestyle she was unwilling to accept—in other words, the more probative the evidence—the more likely the jury would be offended. But the offensive nature of the evidence does not make the photographs inadmissible. As we have often said, gruesome

crimes make gruesome evidence. *State v. Green*, 274 Kan. 145, 148, 48 P.3d 1276 (2002). The same can be said when the evidence is sordid and offensive. If anything, under the facts of this case and given the State's theory, the sordid and offensive nature of the evidence establishes the demonstrative nature of the evidence—it showed the jury defendant's activities, how far those activities strayed from his family life, and how necessary it was that those images and his double lifestyle be hidden from his wife and others.

There was no argument that the two photographs were unrepresentative of the thousands of photographs found on defendant's computer or that the State selected the two most sensational depictions. Apparently, the two exhibits were fair representations of defendant's internet activity.

Consequently, reasonable minds could disagree. The evidence was probative and the prejudice, if any, arose because of the nature of defendant's activities, which the photographs accurately demonstrated to the jury.

McFARLAND, C.J., and NUSS, J., join in the foregoing concurring opinion.

JOHNSON, J., concurring: I also concur with the majority's result, but write separately to clarify my position on the admissibility of the two commercial pornographic images. I would not find that Miller's apparently surreptitious downloading, cataloging, and storage of commercial pornography reasonably tended to prove a motive for him to kill his wife, *i.e.*, the evidence had no probative value in this murder prosecution.

Miller's computer contained literally thousands of pornographic images which had been organized into folders according to activity type. The reasonable inference to be drawn is that Miller had been involved with this computer activity for quite some time prior to his wife's death. Assuming that the wife was unaware of Miller's activities and even assuming, based perhaps on one's own sensibilities, that there was a likelihood that Miller's wife would be so offended by the images that she would leave him, I am nevertheless unaware of any evidence suggesting that Miller would not have

been capable of continuing to pursue his secret infatuation with Internet pornography without killing his wife.

More importantly, the "double life" theory that Miller was motivated to kill his wife to avoid the exposure of his computer pornography habits is counterintuitive. Miller's early declaration to his children that he would be the prime suspect indicates that he had to know that killing his wife in the home would lead to a police investigation. Obviously, such an investigation would carry a significant risk that the computer pornography would be discovered. If Miller was motivated to keep his "double life of pornography" a secret, killing his wife in the home and disclosing to the police that he had been logged into the computer that night were among the worst things he could do. In other words, the State's theory is illogical.

The suggestion that it is improper for us to base our analysis on the assumption that Miller acted in a logical manner in planning his wife's murder is curious. The whole point of a relevancy inquiry is to determine whether there is some " 'natural, necessary or *logical* connection' " between the proffered collateral facts and the point intended to be established. (Emphasis added.) *State v. Gauger*, 200 Kan. 563, 565, 438 P.2d 463 (1968) (quoting *In re Estate of Isom*, 193 Kan. 357, Syl. ¶ 2, 394 P.2d 21 [1964]). If Miller acted irrationally in planning his wife's murder, then there is no basis for the State to manufacture a theory to explain Miller's motive.

Likewise, I reject the contention that the State is entitled to admit evidence relevant to a theory it divines, leaving it to the jury to assess the credibility of the *theory*. The jury's function is to assess the credibility of *admissible* evidence, not to determine the legal question of the admissibility of evidence. The court bears the responsibility for making the threshold relevancy determination of whether, if believed by the jury, the State's theory has a "tendency *in reason* to prove any material fact." (Emphasis added.) K.S.A. 60-401(b). The State should not be permitted to present evidence in support of an unreasonable theory. For example, a prosecutor theorizing that a defendant killed his wife because the defendant was overweight could argue that nude photographs of the defend-

ant were relevant to the fact that defendant was overweight. However, the fallacy is that, without more, there is no logical connection between being overweight and being motivated to kill.

Obviously, Miller's extramarital affair was germane to the State's theory. His desire to be with Parbs could reasonably tend to prove a motive to get rid of any impediment to that goal, *i.e.,* to kill his wife. However, I cannot make a logical connection between the commercial pornography on Miller's computer and his motive to kill his wife. Thus, I would find that all of the testimony about the commercial pornography on Miller's computer was not relevant to the question of whether Miller had a motive to commit the murder. Therefore, the photographic images, while relevant to explain the testimony, were nevertheless irrelevant to establish motive. Lacking any probative value for the murder prosecution, the photographs should not have been admitted.

Nevertheless, the erroneous admission of the evidence does not require reversal. I have no quibble with the majority's harmlessness analysis. However, I would find that reversal is not appropriate because the defense did not contemporaneously object and invited the error. The defense led the district court to believe that its complaint was about the prejudicial effect of admitting *numerous* photographs and then led the court to believe that particular objection had been resolved by the parties' agreement. Under that scenario, reversal would be inappropriate.

BEIER, J., joins in the foregoing concurring opinion.